No. 66,846

KENNETH CREASE, *Appellant,* v. STATE OF KANSAS, *Appellee.*

(845 P.2d 27)

Opinion filed January 22, 1993.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Debra Byrd,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: The appellant, Kenneth Crease, appeals the denial of his K.S.A. 60-1507 motion in which he challenged his convictions, based upon an ex parte communication between the trial judge and at least one juror. The Court of Appeals affirmed the denial in an unpublished opinion filed August 7, 1992. We granted the petition for review.

The main issue is whether the trial judge's ex parte communication with a juror is harmless error. Crease also claims there was insufficient evidence to support the district court's finding that only one juror saw the judge ex parte; the failure of his attorney to object or move for a mistrial when learning of this meeting was ineffective assistance of counsel; and the assignment of this case by Judge Paul W. Clark, presiding judge of the Criminal Division, who was the prosecutor in the original case, to Judge Karl W. Friedel amounted to an appearance of impropriety requiring a new trial.

The background for this appeal is that in January 1981, a jury found Crease guilty of three counts of burglary, four counts of aggravated burglary, five counts of theft, and two counts of felony murder. During one of the burglaries perpetrated by Crease and one or more accomplices, a husband and wife were shot and killed while sleeping. The evidence was conflicting whether

Crease shot one of the victims or whether Crease was in another room when the couple was shot. Crease was 16 years old at the time the offense was committed and was certified to stand trial as an adult. This court affirmed Crease's convictions on direct appeal. *State v. Crease,* 230 Kan. 541, 638 P.2d 939 (1982).

In August 1988, after learning of an ex parte communication between the trial judge, Judge Ray Hodge, and one or more jurors, Crease filed a K.S.A. 60-1507 motion. Crease argued that, because of the ex parte communication, he was denied his right to be present at all critical stages of the trial. He subsequently filed affidavits, including two from jurors, in conjunction with his motion. The affidavits set forth that an ex parte conference between the trial judge and one or more jurors took place during the trial.

The trial judge refused to allow Crease to subpoena the jurors for an evidentiary hearing and subsequently denied Crease's 60-1507 motion. Crease appealed. In an unpublished opinion No. 63,638 filed June 22, 1990, the Court of Appeals reversed and remanded "with directions to hold a meaningful evidentiary hearing."

By way of background, Crease's trial, including voir dire, lasted two months. Jury deliberation began on January 5, 1981, and continued for the next two days. The ex parte conversation occurred on January 7, 1981, sometime prior to 11:35 a.m. A juror, Stephanie Brinkley, pursuant to the suggestion of the trial judge during the ex parte conversation, submitted the following question in writing:

"If it is already pre-determined (it seems) that the defendant is guilty of a crime, whether or not he actually committed the particular act or not, do we as jurors really have a choice in the matter as to whether he is to be judged (by us) guilty or not guilty.

"The State tried to prove he was in the basement and actually committed the act. The defense says otherwise. Are we bound by the statement in [Instruction] 21. Do we have a choice?"

Instruction 21 provided: "A person is criminally responsible for the conduct of another when, either before or during the commission of a crime, and with the intent to promote or assist in the commission of the crime, he intentionally aids or advises the other to commit the crime."

Shortly after 1:35 p.m., Judge Hodge orally responded as follows:

"To answer that question it is contained in the written Instructions in Instruction Number 1. I will read a portion of that to all of you again.

" 'Members of the Jury: It is my duty to instruct you in the law that applies to this case and it is your duty to follow the Instructions. You must not single out one or more Instructions and disregard others. You should construe each [In]struction in the light of and in harmony with the other Instructions, and you should apply the Instructions as a whole to the evidence.' "

The judge then excused the jury to resume deliberations. The jury reached a verdict that afternoon at 4:50 p.m.

An evidentiary hearing was held in February 1991, more than 10 years after Crease's conviction. The Court of Appeals fairly and accurately summarized the testimony as follows:

"At the hearing John Hale, the bailiff at petitioner's trial, testified that during jury deliberations certain jurors were crying and one woman approached him and wanted to see the trial judge. The judge allowed him to bring the woman into his chambers. Hale said he also remained there for awhile. He further testified the juror told the judge she did not want to be a juror and take the responsibility of being a juror. The judge told the juror that, as a juror, she was 'no better than anybody else . . . [and she] should go back and do [her] duty.' Hale thought he brought three jurors in, but he was sure that it was more than one. One juror was a black female and the others were white females. Kenneth Crease was not present for any of this discussion.

"Stephanie Washington Brinkley is the black juror who met with Judge Hodge. She testified she was having trouble accepting the felony-murder and aiding and abetting rules, and stated: 'I just couldn't get over the fact that Mr. Crease was going to be . . . tried for murder . . . although he did not pull the trigger. He . . . wasn't aware that the other guy . . . planned to go down and murder this couple—I couldn't deal with the fact that he was going to be tried for murder even though he didn't commit the act himself.' She also said 'I can't remember if [the sentence] was life or what it was, but we just felt [he] was too young for that. And since he didn't do it, then why make him go through that[?]' She stated that she and Barbara Poppenhagen, another juror, were having difficulty with this and went to see the judge.

"Ms. Brinkley stated the meeting involved her, Ms. Poppenhagen, and the judge. There was no defendant, no bailiff, and no attorney present. She said the judge reread the instructions to her. He told them to 'use the evidence that was presented in court during the trial and base our decisions upon that.' She stated he also told them that in the State of Kansas under

the felony-murder rule 'you're just as guilty—when a felony is committed, you're just as guilty as if you actually did it yourself.'

"Ms. Brinkley was asked:

'Q. And so then the judge instructed you that if he was guilty of the burglary, then he was guilty of the murder?

'A. Yes, just because he was there at the time, uh-huh.'

"She stated three or four people did not want to return a guilty verdict, but the other jurors were pressuring them. Ms. Brinkley said she did not know for sure what she was going to do when she left the judge's chambers. Although she was uncomfortable with the extreme aspect of the felony-murder rule, she succumbed to the pressure of the other jurors and voted guilty. She said there was no pressure exerted by the judge. After having the judge explain things to her, she stated she interpreted it to mean 'that there [was] no other recourse other than to vote guilty.'

"Barbara Poppenhagen testified she did not remember going into the judge's chambers. However, she later added it was possible she was in his chambers.

"The jury foreman, Frank Rider, testified that Ms. Brinkley had some problems with the case. He recalled when she returned from the judge's chambers she was distraught and upset. She asked Rider if she had to vote guilty according to the instructions, to which he replied, yes, they must follow the instructions. He recalled, from a previous affidavit, Ms. Brinkley told him the judge had talked to her about the felony-murder rule and that was why she would have to vote guilty. Rider thought Ms. Brinkley went to see the judge by herself.

"Ray Hodge, the trial judge, stated:

'As I recall, she was a black lady. She came into the office what I perceived going off from the jury. I believe she stated she didn't understand the jury instructions as it related to the felony murder rule. I tried to get her to write a note, put it in writing and send it back out. I believe I read her a part of the jury instructions or duties and admonitions about not allowing sympathy and prejudice to enter into her deliberations. She said she just couldn't do it. She couldn't do it. She couldn't do it. I had assumed in my own mind, although I didn't express it, that they were on the verge of finding Mr. Crease guilty, and she didn't want to be part of finding a young man guilty under the felony murder rule. That was my own perceptions. After giving her the admonitions that are contained in the jury instructions, I sent her back into the jury room to continue deliberations, and then at some point after that made a record of it, and—of what transpired back in chambers and offered both sides an opportunity to cross examine that—inquire into the juror if they wanted to, and I believe they elected not to.'

He also felt that there were two jurors, one black and one white, who came to see him. He thought the black juror was having sympathy for the defendant so he instructed her not to have sympathy for Mr. Crease. Judge

Hodge believed he told her she would have to 'find the defendant guilty or not guilty.' The judge also stated:

'It was my attempt, be it right or be it wrong, to resolve a critical situation of a—what I want to classify as a turncoat juror, or a juror that heavily in her heart, for religious reasons or otherwise, was [having] difficulty in finding a young man guilty of a very heinous crime or crimes.'

Judge Hodge testified that, after his request to Ms. Brinkley to put any questions in writing, she did so, and he then answered the question in the courtroom for the entire jury. The judge then called the attorneys into his chambers with a court reporter and informed them of his conversation with Ms. Brinkley.

"His statements to counsel were:

'Gentlemen, I really think that we need to bring Mrs. [Brinkley] in to question her, and the question is when—for the record, Mrs. [Brinkley] came into my chambers this morning and asked me if she didn't understand a law, one of my instructions, if I could explain it to her. I told her that she should have a note sent out and I would answer the question on the note if I possibly could. She then said: Well, what if I am the only one that doesn't understand it.

'I still suggested to her that she have a note sent out. She then started in crying very heavily saying that she just couldn't do it, she wanted off the jury, she just couldn't do it. I admonished her according to the jury instructions that she cannot allow prejudice or sympathy to enter into her deliberations, that the only thing that her job is to find the guilt or innocence of the Defendant in accordance with the instructions and the evidence. She then returned sobbing through the Court's Chambers' door and presumably back into the jury room.'

"Paul Clark, the prosecutor in the case and now a judge, testified he saw one woman leave the judge's chambers and go into the jury room. Immediately after she left, he and the other attorneys were called into the chambers.

"Charles Millsap, another prosecutor in the case, testified that he thought the State's case was in trouble after hearing about the condition of one of the jurors.

"Warner Eisenbise, the defendant's attorney, stated he was called into the judge's chambers and told about the ex parte communication. The defendant was not present for this conference. Mr. Eisenbise thought Ms. Brinkley would be a good juror for the defendant and therefore he did not ask for a mistrial or a hearing to question her. He stated that, even though it may have been a legal error, he felt it was a better strategy to keep her on the jury. He felt he did discuss the ex parte communication with Mr. Crease, but he is not sure when. Mr. Eisenbise admitted he made an error by waiving the defendant's right to be present during this discussion.

"Kenneth Sperxarth, another juror, testified that he did not know any juror spoke with the judge. He stated that many of them were concerned about applying the felony-murder rule and they asked the judge to repeat

the instruction, which he did in front of the whole jury. He felt that was the turning point for the guilty verdict.

"Defendant Kenneth Crease testified he was not at the meeting with Judge Hodge and the juror(s), he was never informed of the juror(s)-judge communication, and he never waived his right to be present."

Marion Crease, defendant's mother, testified that two or three years after the trial an alternate juror told her about the communication and she began to investigate it.

Evidence also was presented concerning the trial judge's notification to trial counsel of the ex parte communication. The trial judge testified he called trial counsel into his chambers to inform them of his ex parte communication with Brinkley. A court reporter was present at this meeting, but was not the same court reporter who was present during the trial. Apparently, the reporter who took the trial testimony was not aware that any other proceeding had taken place. As a result, when different counsel was appointed to handle the direct appeal and that counsel ordered a complete transcript, the conference in chambers was not included and Crease's counsel on appeal had no knowledge of the conference. The judge's meeting with the attorneys was not transcribed until January 4, 1991.

After hearing the testimony, Judge Friedel held that Judge Hodge's ex parte communication with the juror was error and, after commenting that it was a very close and difficult question, he ruled that the error was harmless. The Court of Appeals discussed the applicable law, summarized what had occurred, and held the error to be harmless beyond a reasonable doubt, stating:

"The facts before us in the instant case are as follows: one juror, and possibly two, was very concerned about finding the defendant guilty under the Kansas felony-murder rule. In chambers, the trial judge explained briefly the law involved and repeated the instructions. He directed that a written question be submitted and admonished them to do their duty.

"The court informed counsel of the meeting. Counsel for the defendant apparently saw no harm in what had occurred and desired to keep on the jury a juror who was showing reluctance to convict the defendant. He also did not want a mistrial.

"The juror indicated that with the application of the felony-murder rule (which is the law) there was no other reasonable action to take but convict. Some three hours after the court appropriately answered the requested written question in open court, and about seven hours after the contact with the juror(s), the jury returned a verdict of guilty.

"The petitioner's trial counsel believes he informed petitioner of the proceedings. The issue was not deemed important enough to raise in the direct appeal.

"We find that the judge's contact with the juror(s) was not of such a nature as to materially prejudice the petitioner's rights. While it is regrettable that the contact occurred, the substance of the judge's comments was not prejudicial. They were communicated to petitioner's counsel, who saw no problem with them. The essence of the judge's comments was little other than a recapitulation of some of the instructions briefly stated to a juror who only wanted to know if she had to follow them.

"The verdict which came seven hours later was in no way influenced by the judge's ex parte comments.

"Taking into account the foregoing as well as the evidence of petitioner's guilt, we find, beyond a reasonable doubt, the claimed error was harmless."

## I. HARMLESS ERROR

There is no dispute that an ex parte communication between Judge Hodge and at least one juror occurred and that this communication violated Crease's constitutional right to be present at all critical stages of the trial. This constitutional right is rooted in the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *United States v. Gagnon,* 470 U.S. 522, 526, 84 L. Ed. 2d 486, 105 S. Ct. 1482, *reh. denied* 471 U.S. 1112 (1985). Kansas has codified the right of presence at K.S.A. 22-3405. This court has held that "[a] conference between a trial judge and a juror is a critical stage of the proceeding requiring the presence of the defendant." *State v. Lovely,* 237 Kan. 838, Syl. ¶ 3, 703 P.2d 828 (1985); see *State v. Garcia,* 233 Kan. 589, Syl. ¶ 2, 664 P.2d 1343 (1983) (a defendant's constitutional and statutory right to be present includes the right to be present "whenever the court communicates with the jury"). Additionally, K.S.A. 22-3420(3) requires that once the jury has begun deliberations, any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is absent voluntarily. Crease was not absent voluntarily.

Objections to the ex parte communication were raised for the first time in Crease's K.S.A. 60-1507 motion. "[T]rial errors affecting constitutional rights may be raised [in a 60-1507 motion] even though the error could have been raised on appeal, provided there were exceptional circumstances excusing the failure to ap-

peal." Rule 183(c)(3) (1992 Kan. Ct. R. Annot. 143). Here, there were exceptional circumstances. When advised of the communication, Crease's trial counsel did not object or ask for a mistrial. If counsel discussed the matter with Crease, it was after the fact. See *State v. Antwine,* 4 Kan. App. 2d 389, Syl. ¶ 12, 607 P.2d 519 (1980)("An attorney cannot waive the right of an accused to be present at trial without first having discussed the matter with the accused."). Crease's trial attorney never raised the issue in post-trial motions and never informed appellate counsel of the matter. Although a court reporter was present in 1981 when Judge Hodge apprised the attorneys of his communication with the juror, the proceeding was not transcribed until January 4, 1991. Crease's appellate counsel at the time of the direct appeal was not aware of the error.

The question before us is whether this constitutional error requires reversal.

"An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. [Citations omitted.] Thus, before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]" *State v. White,* 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990).

See *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986); *Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967); *State v. Peltier,* 249 Kan. 415, 426, 819 P.2d 628 (1991), *cert. denied* ____ U.S. ____, 120 L. Ed. 2d 875 (1992). On appeal, the defendant has the burden of showing the error substantially prejudiced his or her rights. *Garcia,* 233 Kan. at 596.

The Court of Appeals held that any error was harmless beyond a reasonable doubt because the ex parte discussion did not materially prejudice Crease's rights and did not affect the verdict. The court also took into account the evidence of Crease's guilt.

Crease takes exception to the Court of Appeals' statement that "[t]he essence of the judge's comments was little other than a recapitulation of some of the instructions briefly stated to a juror who only wanted to know if she had to follow them." Judge

Hodge and Brinkley recalled different instructions being discussed. Crease argues:

"It is difficult to determine which situation is more pernicious—Judge Hodge's version of reinstructing an emotionally distraught 'turncoat juror,' who was preventing the jury from reaching a verdict, to not let sympathy influence her decision, or [Brinkley's] version of the judge reinstructing her regarding the felony murder rule and implying that if . . . Crease was guilty of burglary, as she had stated she believed, then he was also guilty of murder. Both, in effect, constitute directions as to what the 'proper' verdict should be."

Exactly what Judge Hodge said will never be known because no record was made of the ex parte communication. Additionally, a different meaning or significance could be imparted to a jury instruction depending upon whether the instruction was read verbatim or paraphrased.

Most states follow the harmless error rule, but some have modified the rule concerning a judge's ex parte communication with a juror. In Arizona, an ex parte communication between a judge and jury that is not recorded is presumed prejudicial. *State v. Hilliard,* 133 Ariz. 364, 651 P.2d 892 (1982). Arkansas and Florida also have held that an ex parte communication between the judge and jury is not harmless error if the record is incomplete. See *Tarry v. State,* 289 Ark. 193, 710 S.W.2d 202 (1986); *Coley v. State,* 431 So. 2d 194 (Fla. Dist. App. 1983); *Caldwell v. State,* 340 So. 2d 490 (Fla. Dist. App. 1976). Illinois has held that an ex parte communication by a judge with a juror that was not recorded is reversible error even if the court assumed that what was said and done by the judge did not influence the jury. *People v. Childs,* 230 Ill. App. 3d 993, 1001, 596 N.E.2d 108 (1992).

Although we cannot condone an off-the-record ex parte communication by a judge with a juror, we are not inclined at this time to adopt such a "bright line" rule. The issue then is whether we can say the error was harmless beyond a reasonable doubt.

Obviously, there is substantial competent evidence to support the findings of the district court in this case. That is not the standard of review, however. Our standard of review on this issue requires a review of the entire record by this court. "Since *Chapman,* we have repeatedly reaffirmed the principle that an oth-

erwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. [Citation omitted.]" *Delaware v. Van Arsdall,* 475 U.S. at 681.

Our examination of the entire trial transcript convinces us the error was harmless beyond a reasonable doubt. The record indicates that Crease and his accomplice, or accomplices, committed an aggravated burglary and that one of the burglars carried a high-powered rifle and one carried a handgun similar to one a witness previously had observed in Crease's bedroom. Crease's own testimony acknowledged his participation in the burglary and his awareness that at least one rifle was carried into the house in which the sleeping couple was shot and killed during the burglary. Given the burglary convictions, only if one or more of the jurors did not follow the instructions could there have been a hung jury or an acquittal on the felony-murder charges.

Brinkley testified that the judge did not pressure her and that she had not decided how she would vote when she left his chambers. No objection was, or is, made to the trial judge's instruction to the jury in response to Brinkley's written question. Several hours later the jury returned its verdict of guilty.

We are convinced the ex parte communication between the judge and juror, or jurors, had little, if any, likelihood of changing the verdict, and thus we hold the error to be harmless beyond a reasonable doubt.

## II. JUROR OR JURORS

Crease argues there was not substantial competent evidence to support the trial court's finding that Judge Hodge had an ex parte communication with only one juror. In support of his argument, Crease directs this court's attention to the 1991 testimony of Brinkley, the bailiff, and Judge Hodge, who all stated that they believed more than one juror visited the judge in his chambers during deliberations. Additionally, Crease points out that Barbara Poppenhagen admitted during a telephone conversation with Crease's mother in 1987 she had gone to visit the judge in his chambers even though at the 1991 hearing Poppenhagen said she could not remember going to the judge's chambers. The Court of Appeals did not address directly Crease's argument.

If there is substantial competent evidence to support the trial court's finding of fact, an appellate court will not disturb that finding on appeal. *State v. Smith,* 244 Kan. 283, 288, 767 P.2d 1302 (1989). Shortly after visiting with the juror, Judge Hodge informed the attorneys of what had transpired. According to the transcript of the 1981 meeting, Judge Hodge only referred to one juror. The evidentiary hearing occurred in 1991. Because the 1981 recollection of events was much closer in time to the event in question than the 1991 evidentiary hearing, there is substantial competent evidence to support the trial court's finding of fact.

### III. EFFECTIVE ASSISTANCE OF COUNSEL

Crease claims he was denied effective assistance of counsel because his trial attorney did not object to or request a hearing regarding the ex parte communication.

The Court of Appeals stated:

"In Kansas, the test to determine whether counsel has been ineffective is stated in *Chamberlain v. State,* 236 Kan. 650, 654-55, 694 P.2d 468 (1985): 'Under the first part of this two-pronged approach, a convicted defendant must show counsel's representation fell below an objective standard of reasonableness. . . . [The second requirement is] that [the] defendant establish a reasonable probability the decision challenged would have been different had he received effective assistance.'

"*Chamberlain,* 236 Kan. at 655, also states that the attorney's performance should be judged ' "in light of all the circumstances." ' [Crease] cites to *Murray v. Carrier,* 477 U.S. 478, 496, 91 L. Ed. 2d 397, 106 S. Ct. 2639 (1986), as support that an isolated error may be enough to find ineffective assistance of counsel if the 'error is sufficiently egregious and prejudicial.' However, [Crease] does not state how the claimed error by his trial attorney is egregious and prejudicial.

"At the time the error occurred, defense counsel believed he had a sympathetic juror and hoped she would cause a hung jury. The prosecution even believed that its case was in trouble at that time based on Ms. Brinkley's conversation with Judge Hodge. The defense counsel made a trial decision that, in retrospect, may not have been a good one. However, this decision does not fall below the *Chamberlain* standard."

Crease disagrees, pointing out that trial counsel could have requested a hearing without challenging Brinkley's continued participation as a juror. Crease's trial counsel testified at the 1991 hearing that he did not want to "stir up the waters" because defense strategy was to invoke sympathy for the defendant and he felt Brinkley was sympathetic to his client. "If the counsel's

act was the result of a reasonable defense tactic, then this court will find his assistance to have been competent and effective." *State v. Logan,* 236 Kan. 79, 83, 689 P.2d 778 (1984).

Crease also argues hindsight: Because the judge's and Brinkley's recollections of what was said differed, the trial attorney erred in basing his decision upon the judge's representation of what occurred during the ex parte communication. Crease claims the trial attorney failed to make an informed decision because he could have, but failed to, clarify how Brinkley interpreted the communication. Hindsight is not a viable argument.

" 'It is one of the characteristics of human experience that hindsight often reveals alternative courses of conduct that may have produced different results if only they had been employed. Hindsight, however, is not the vantage point from which we judge allegations of incompetence. [Citation omitted.] It may be that had defendant's counsel on appeal conducted the defense at trial, he would have done things differently. Whether or not he would have fared better before the jury is a matter of conjecture. Where experienced attorneys might disagree on the best tactics, deliberate decisions made for strategic reasons may not establish ineffective counsel. [Citation omitted.]' " *State v. Kendig,* 233 Kan. 890, 896, 666 P.2d 684 (1983).

Both the trial court and the Court of Appeals properly ruled that Crease was not denied effective assistance of counsel.

## IV. ASSIGNMENT BY JUDGE CLARK

Crease contends that Judge Clark's assignment of this case to Judge Friedel created an appearance of impropriety because Judge Clark had prosecuted Crease's trial and would be a witness at the hearing.

The judicial disqualification standard, as set forth in *State v. Strayer,* 242 Kan. 618, Syl. ¶ 3, 750 P.2d 390 (1988), is

"whether the charge of lack of impartiality is grounded on facts that would create reasonable doubt concerning the impartiality, not in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances."

The Court of Appeals held that there was no appearance of impropriety, reasoning:

"[Crease] made a similar argument before this court in *Crease v. State,* unpublished opinion No. 63,638 filed June 22, 1990, to which this court stated that the action was a purely administrative function and there was no appearance of impropriety. [Crease] states that the Court of Appeals'

reliance on *Collins v. Kansas Milling Co.*, 210 Kan. 701, 504 P.2d 586 (1972), is distinguishable because, not only was Judge Clark prejudiced, he was also to be called as a witness before the assigned judge and have his credibility judged. However, [Crease] offers no authority to support this distinction. Also, the possibility that Judge Clark would testify was also before the Court of Appeals on that appeal and did not change the opinion."

The administrative judge assigned the case to Judge Clark, who, as the presiding judge of the criminal division, assigns criminal cases for hearing. Clearly Judge Clark was disqualified from hearing the case and better practice would have been for the administrative judge to have assigned the case for hearing, thus eliminating this issue. The best practice would be to request a judge from outside the judicial district to be assigned if the local judge's testimony is material.

Here, Judge Clark's testimony was of little importance. He understandably had little recollection independent of the record. He did recall seeing one black juror leave the judge's chambers and enter the jury room. We consider that of little significance because Judge Friedel based his decision that only one juror was involved on the record of Judge Hodge's meeting with the attorneys, which showed Judge Hodge only referred to one juror. We do not find reversible error on the facts of this case.

Affirmed.