No. 76,915

STATE OF KANSAS, *Appellee*, v. JOHN MCGINNES, *Appellant*.

(967 P.2d 763)

Opinion filed November 6, 1998.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Kirsten Ehlen*, student intern, and *Jessica R. Kunen*, chief appellate defender, were with him on the brief for appellant.

*Kenley J. Thompson*, assistant county attorney, argued the cause, and *Brandi L. Dunning*, assistant county attorney, and *Robert Forer*, county attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant was convicted of aggravated indecent liberties with a child. His constitutional right to be present at every critical stage of the proceeding was violated by the trial judge's ex parte communication with the jury during its deliberation. The Court of Appeals concluded the error was harmless beyond a reasonable doubt and affirmed. 24 Kan. App. 2d 921, 955 P.2d 1325 (1998). We granted the defendant's petition for review and now reverse and remand for further proceedings.

In early July 1994, A.C., 8 years old, and her brother, C.C., 7 years old, were visiting their grandmother. The children decided to visit a next door neighbor, Jerry Merrick. The defendant, John McGinnes, a friend and coworker of Merrick who had known Merrick for 25 years, had spent the night with Merrick and was present when the children visited.

Merrick testified that soon after he let the children in, C.C. left. According to Merrick, the defendant then asked him to go to the store to get the defendant a package of cigarettes. Merrick wondered why the defendant wanted him to get cigarettes as Merrick's truck had a bad battery and would not start. Merrick stated that he took the defendant's truck into town to get the cigarettes, a journey which took 8 to 10 minutes round trip. When he returned, the defendant and A.C. were sitting in the same chairs they had been sitting in when he left. Shortly thereafter, A.C. left.

Nine months later, in April 1995, Merrick was drinking with A.C.'s grandmother and talking about recent sex crimes in the area. Merrick, who admitted that he was intoxicated at the time, mentioned to the grandmother the incident 9 months earlier when the defendant asked him to go for cigarettes. Merrick suggested that the grandmother ask A.C. if anything had happened with the defendant in Merrick's absence.

At trial, Merrick admitted that earlier in the spring he and the defendant had a falling out over a chain saw which the defendant

claimed had been ruined by Merrick and as a result of the incident their joint business endeavor ended. However, Merrick stated that soon after the argument he and the defendant started working together again.

The grandmother told her daughter, L.C., about her conversation with Merrick. The next day L.C. questioned A.C. as to whether anything happened when she visited Merrick's trailer. L.C. testified that A.C., now 9 years old, immediately started crying and said that the defendant had touched her private parts under her clothes and made her touch his private parts.

L.C. immediately walked to the house of her neighbor, Rockey Whinery, who was the chief of police. When she discovered that Chief Whinery was not home, she dialed 911 to report the incident. Chief Whinery and Officer Ash immediately came to her house. A.C. was interviewed by Chief Whinery. Neither Chief Whinery nor Officer Ash testified at trial.

Several days later A.C. was interviewed by Patricia Farris, a Social and Rehabilitation Services social worker. A.C. related to Farris that she went to Merrick's trailer and the defendant asked Merrick to get him some cigarettes. A.C. stated that after Merrick left, the defendant touched her on her private parts and forced her to touch him on his private parts. A.C. claimed that the defendant told her that if she told anyone about this touching, he would do it again. Farris testified that A.C. made a mark on a drawing of an adult male to show where she had been forced to touch the defendant and also marked a drawing of a girl to show where she had been touched. A videotape of A.C.'s interview with Farris was shown to the jury at trial.

A.C. was called as a witness for the State and testified that the defendant had touched her inside her panties and grabbed her hand and put it inside his underwear. She stated that this occurred at Merrick's house while Merrick had gone to get cigarettes. When asked whether she had ever attempted to light any cigarettes while in the trailer, she denied doing so.

The defendant testified on his own behalf. He denied touching A.C. He stated that A.C. and her brother had visited Merrick's trailer on the day in question. He testified that A.C. and C.C. kept

trying to light some wet cigarettes that were on the table in the trailer. He knew that Merrick's truck was not working and Merrick was out of cigarettes so he asked Merrick if Merrick wanted to borrow his truck to get some cigarettes. The defendant testified that he did not ask Merrick to get cigarettes for him because the type of cigarettes the defendant smoked were not sold in town.

The defendant testified that after Merrick left, he went outside to make sure that Merrick had attached the battery charger to the truck. When he went back inside, he found A.C. trying to light one of the wet cigarettes and yelled at her. According to the defendant, A.C. threw the cigarette on the floor, sat down, and began watching television until Merrick returned.

The defendant further testified that Merrick and he had an argument because Merrick had borrowed his gas can and put straight gasoline in it rather than a gas and oil mixture. This in turn caused the defendant to put the straight gas in his chain saw, with the result that the chain saw was damaged. The defendant told Merrick to buy him a new chain saw and Merrick became angry.

The defendant admitted on cross-examination that while his brand of cigarettes was not sold in town, he sometimes smoked menthols which were available. He indicated that on occasions in the past he had asked Merrick to get him a pack of cigarettes.

The jury began its deliberations at 10:35 a.m. Soon thereafter, the first of the complained-of incidents occurred. The actual occurrence itself was not on the record. Instead, we construct the event as best we can from the recollection of the parties.

After deliberations began, the trial judge happened to be outside the jury room. One of the jurors posed a question, possibly to another juror, as to why the jury had not heard testimony from Police Chief Whinery. The substance of what occurred next was related to the court by the defendant's counsel:

"My recollection was that Judge advised us—[the trial judge] advised [the prosecutor] and I about this situation where he was outside of the door, that he overheard one of the witnesses [*sic*] ask, 'I wonder why we did not hear the testimony of Police Chief Rocky Whinery?' and then [the trial judge] told us or advised us that he had advised the jurors at that time that 'Rocky Whinery is at the law enforcement academy and was unable to be present at this trial. You

should not concern yourselves with his absence, as to bring him back for the trial would have interfered with his training, and his absence here should not concern you,' and that is shown in the motion as a quote. It is actually a paraphrase. I'm quoting—I mean, we were not recording, but that's as near as I can remember what was said."

The prosecutor stipulated that the defense counsel's recollection of the event was accurate.

The second incident occurred soon thereafter. At 12:30 p.m. the jury requested a readback of the victim's mother's testimony. Following this readback, the trial judge, without consulting either counsel *sua sponte* instructed the jury as follows:

"All right. Let me just make a couple of comments. And, that is, you have heard the testimony of each of the witnesses. You have heard the Court's instructions as to the law which applies to this case, and you have those instructions with you in the jury room, and they are in writing. And you have been given the exhibits which have been offered and received in evidence.

"So I would ask you to focus your minds on the testimony that you have heard. I would ask you to re-read the instructions that I have given you, and I would ask you to look at the exhibits that have been admitted into evidence.

"And if you will concentrate on these things and on what has been presented and not allow yourselves to be diverted or not try to speculate on things that have not been presented, I think it will be helpful to you in arriving at a decision.

"So at this point, we'll let you go back into the jury room and continue your deliberations. And as soon as your lunch orders are received, that will be brought in to you, and you can go ahead with your discussions and so on while you're having lunch.

"And, again, if you have any questions, feel free to write those down, and they will be given to me. I will review them with the attorneys, and we'll try to get the appropriate answers for you. So thank you very much. You may now return to the jury room."

After the jury returned to the jury room, the defendant moved for a mistrial on the ground that the supplemental instruction was similar to an *Allen* charge. The State argued that the court had simply reiterated the instructions previously given to the jury. The trial judge denied the request.

At 3:00 p.m. the same day, the jury found the defendant guilty of aggravated indecent liberties with a child. The defendant filed a motion for a change of judge and a new trial. A new district judge was assigned to hear the motion for new trial.

In preparation for the hearing on the motion for new trial, defense counsel subpoenaed the trial judge to testify regarding his statements and actions during and after the ex parte communications. However, the trial judge informed defense counsel that he would not honor the subpoena because his son had been in a car accident and the judge was going to spend time with his family. The prosecutor was added into the discussion by conference call and agreed not to object to the admission of hearsay statements by the trial judge if the judge was not required to be at trial. The trial judge then telephoned the hearing judge and explained the situation, and the hearing judge agreed to release the trial judge from the subpoena and stated that he would have allowed him to be deposed later if necessary. However, the hearing judge stated on the record that he thought the trial judge's testimony was not necessary as the trial judge agreed with both defense counsel's and the State's recollection of the events surrounding the ex parte communication.

During the hearing on the motion for new trial, the defense counsel stated that he had contacted a number of jurors who had informed him that the trial judge's ex parte comments had no influence on their decision. However, defense counsel stated that he had been unable to contact one juror, although he proffered that the juror's stepson had stated that the juror had been influenced in some manner by the trial judge's statements.

The court determined that the defendant had failed to establish that the trial judge's ex parte communication substantially prejudiced his rights. The court also found that the supplemental instruction given by the trial judge was not objectionable and denied the defendant's motion for new trial.

## COURT OF APPEALS' DECISION

In a split decision, the Court of Appeals affirmed the defendant's conviction, concluding that although the trial judge's ex parte communication with the jury was error, it was harmless because no actual prejudice was shown. 24 Kan. App. 2d at 927-28. The Court of Appeals also found that the trial judge's giving of a supplemental instruction without consulting with counsel was error but again

determined that it was harmless error. 24 Kan. App. 2d at 928-29. Finally, the Court of Appeals determined that the court did not err in releasing the trial judge from the defendant's subpoena. 24 Kan. App. 2d at 930.

In a dissent, Judge Knudson concluded that he would have reversed the defendant's conviction and granted the defendant a new trial. The dissent reasoned that: (1) the trial judge's ex parte communication with the jury was a substantive misstatement of the law and had a direct impact on the concept of reasonable doubt and (2) the *sua sponte* supplemental instruction compounded the damage of the ex parte communication and further shifted the burden of proof by requiring the defendant to present evidence to establish reasonable doubt. 24 Kan. App. 2d at 930-33.

## DISCUSSION AND ANALYSIS

The trial judge's ex parte communication with the jury and his *sua sponte* supplemental instruction to the jury constituted trial error. K.S.A. 22-3405, as well as the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment, require the defendant's presence at every critical stage of a trial, including a conference between a trial judge and a juror. *Crease v. State*, 252 Kan. 326, 333, 845 P.2d 27 (1993); *State v. Lovely*, 237 Kan. 838, 843-44, 703 P.2d 828 (1985). See also *State v. Garcia*, 233 Kan. 589, Syl. ¶ 2, 664 P.2d 1343 (1983) (holding that a defendant's constitutional and statutory right to be present includes the right to be present whenever the court communicates with the jury). Further, K.S.A. 22-3420(3) requires that once the jury has begun deliberations, any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is absent voluntarily. *Crease*, 252 Kan. at 333. Thus, there is no question that the trial court's ex parte communication with the jury violated the defendant's constitutional right to be present at all critical stages of the trial. The question, therefore, is whether this error requires reversal.

### The Ex Parte Communication

Before we may declare an error of constitutional magnitude harmless beyond a reasonable doubt, we must be able to decide beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *Crease*, 252 Kan. at 334. An analysis of our decisions in this regard is instructive.

In *Crease*, during jury deliberations, the trial judge communicated with a juror on an ex parte basis regarding instructions concerning felony murder and guilt or innocence. Pursuant to the suggestion of the trial judge during the ex parte conversation, the juror submitted the following question in writing:

" 'If it is already pre-determined (it seems) that the defendant is guilty of a crime, whether or not he actually committed the particular act or not, do we as jurors really have a choice in the matter as to whether he is to be judged (by us) guilty or not guilty.

'The State tried to prove he was in the basement and actually committed the act. The defense says otherwise. Are we bound by the statement in [Instruction] 21. Do we have a choice?'

Instruction 21 provided: 'A person is criminally responsible for the conduct of another when, either before or during the commission of a crime, and with the intent to promote or assist in the commission of the crime, he intentionally aids or advises the other to commit the crime.' " 252 Kan. at 328.

In answer to the juror's question, the judge in *Crease* orally and on the record responded:

" 'To answer that question it is contained in the written Instructions in Instruction Number 1. I will read a portion of that to all of you again.

' "Members of the Jury: It is my duty to instruct you in the law that applies to this case and it is your duty to follow the Instructions. You must not single out one or more Instructions and disregard others. You should construe each [In]struction in the light of and in harmony with the other Instructions, and you should apply the Instructions as a whole to the evidence." ' " 252 Kan. at 329.

Three hours later, the jury reached a verdict. In determining that the error was harmless beyond a reasonable doubt, we relied heavily on the overall strength of the evidence of guilt. We outlined this evidence in detail, indicating that even the defendant's own testimony acknowledged his participation in the burglary and his awareness that at least one rifle was carried into the house in which

the sleeping couple was shot and killed during the burglary. We noted that, given the burglary convictions, only if one or more jurors did not follow the instructions could there have been a hung jury or acquittal on the felony-murder charges. 252 Kan. at 336. We also noted that a judge did not pressure the juror and that no objection was made to the trial court's instruction to the jury in response to the written question of the juror. 252 Kan. at 336.

We again revisited this same issue in *State v. High*, 260 Kan. 480, 922 P.2d 430 (1996). High was convicted by a jury trial for aggravated kidnapping, first-degree murder, and felony theft. Among other errors, the defendant alleged that an ex parte communication by the trial judge with a juror constituted error requiring reversal. We, however, ruled otherwise under the following facts:

In *High*, the Shawnee County District Court Administrator's office received an anonymous telephone call on voice mail during a lunch break when the jury was deliberating. The trial judge gathered the defendant, his attorney, and the State's attorney, and the administrative assistant from the court administrator's office into his chambers after lunch. The trial judge described the contents of the telephone call as follows:

" 'Well, we are all assembled outside the presence of the jury for the purpose of considering an anonymous phone call received in the Court Administrator's office which I think could be best described as a, a message which purports to tell us that, that one of the jurors, namely Deana Smith has some sort of, apparently, telephonic business contact with persons or I guess she says members of the Gardner family [victim's family] in a business sense through her employment with the Kansas Building Trades, and we, in discussing it, thought maybe—and I think the word "Fund" is mentioned, and it probably does relate to workmen's compensation claims that the union, I guess, is processing in one way or another for employees at Gardner Floor.' " 260 Kan. at 484.

The judge asked for suggestions on how to proceed. There was disagreement but there was no objection to the way the trial judge elected to proceed. He indicated to the parties that he would call the juror into chambers without the parties being present, interrogate the juror on the record, read the record to the parties, and then ask the parties on suggestions on how to proceed based on

the results. This took place and no objections or suggestions were voiced at that time. The court declined to strike the juror from the panel.

While we recognized in that case that error had been committed we had "absolutely no hesitancy in declaring, beyond a reasonable doubt, that the error had little, if any, likelihood of having changed the result of the trial." 260 Kan. at 486. In reaching this conclusion we noted:

"It would be difficult to conceive a matter requiring a conference between a trial judge and a juror involving a factual basis of less significance. . . . No objection was voiced to the plan as stated by the trial court. No complaint was voiced when a record of the conference was read to the parties. No facts came out at the meeting which cast any doubt on the juror's fitness to sit on the case. . . . The facts of the ex parte conference herein involve a matter considerably less significant than shown in *Crease*." 260 Kan. at 486.

While not specifically mentioned in connection with this alleged error, we also noted that the evidence against the defendant was overwhelming. See 260 Kan. at 487.

The United States Supreme Court has also addressed the issue of the harmless error rule as applied to a judge's ex parte communication with jurors. In *Rushen v. Spain*, 464 U.S. 114, 78 L. Ed. 2d 267, 104 S. Ct. 453 (1983), the United States Supreme Court determined that an unrecorded ex parte communication between the trial judge and a juror was subject to harmless error analysis and reversed the United States Court of Appeals for the 9th Circuit which held that an unrecorded ex parte communication between the trial judge and juror can never be harmless error. In reaching its conclusion, the Court noted:

"Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant. 'At the same time and without detracting from the fundamental importance of [these rights], we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving [such constitutional] deprivations are [therefore] subject to the general rule that remedies should be tailored to the injury suffered . . . and should not necessarily infringe on competing interests.' *United States v. Morrison*, 449 U.S. 361, 364[, 66 L. Ed. 2d 564, 101 S. Ct. 665] (1981); see also *Rogers v. United States*, 422 U.S. 35, 38-40[, 45 L. Ed. 2d 1, 95 St. Ct. 2091] (1975). In this spirit, we have previously

noted that the Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their role.' *State v. Phillips*, 455 U.S. 209, 217[, 71 L. Ed. 2d 78, 102 S. Ct. 940] (1982). There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

"This is not to say that ex parte communications between judge and juror are never of serious concern or that a federal court on habeas may never overturn a conviction for prejudice resulting from such communications. When an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties. The prejudicial effect of a failure to do so, however, can normally be determined by a post-trial hearing. The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred. [Citations omitted.] Post-trial hearings are adequately tailored to this task. [Citations omitted.]

"The final decision whether the alleged constitutional error was harmless is one of federal law. *Chapman v. California*, 386 U.S. 18, 20-21[, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065] (1967). Nevertheless, the factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness. See 28 U.S.C. § 2254(d); *Sumner v. Mata*, 449 U.S. 539[, 66 L. Ed. 2d 722, 101 S. Ct. 764] (1981). The substance of the ex parte communications and their effect on juror impartiality are questions of historical fact entitled to this presumption. Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of 'convincing evidence' to the contrary, by the federal courts. [Citation omitted.] Here, both the State's trial and appellate courts concluded that the jury's deliberations, as a whole, were not biased. This finding of 'fact'—on a question the state courts were in a far better position than the federal courts to answer—deserves a 'high measure of deference', [citation omitted], and may be set aside only if it 'lack[s] even "fair support" in the record.' *Marshall v. Lonberger*, 459 U.S. at 432[, 74 L. Ed. 2d 646, 103 S. Ct. 843]. The absence of a contemporaneous recording will rarely deprive the finding of 'even "fai[r] suppor[t]" in the record.' " 464 U.S. 117-20.

The Court concluded that the post-trial hearing was more than adequate to support a conclusion that the juror's presence on the jury did not prejudice the respondent, especially in light of the fact that the ex parte communication was innocuous, did not discuss any fact in controversy or any law applicable to the case, and simply

assured the juror that there was no cause for concern. 464 U.S. at 121.

In *Rogers v. United States,* 422 U.S. 35, 45 L. Ed. 2d 1, 95 S. Ct. 2091, (1975), the Court reversed a conviction based upon the ex parte communication of the trial judge with the jury concerning the nature of sentence to be imposed. The defendant was charged under federal statute with making oral threats to take the life of or to inflict bodily harm upon the President of the United States. After deliberating for almost 2 hours without reaching a verdict, the jury inquired in writing whether the court would " 'accept the Verdict— "guilty as charged with extreme mercy of the court." ' " Without notifying the petitioner or his counsel, the court instructed the marshal who delivered the note " 'to advise the jury that the Court's answer was in the affirmative.' " Within 5 minutes, the jury returned that verdict. 422 U.S. at 36-37.

The Supreme Court noted that the actions of the trial court violated Federal Rule of Criminal Procedure 52(a), as well as denying the defendant the right to be present during all critical stages of the trial. The Court stated that the nature of the information conveyed to the jury, in addition to the manner in which it was communicated, did not permit a conclusion that the error was harmless beyond a reasonable doubt. At the very least, the jury should have been reminded that its recommendation would not be binding in any way, and that it should reach its verdict without regard to what sentence might be imposed. 422 U.S. at 40.

From our examination of the above opinions concerning ex parte communications with the jury, we are able to discern several factors significant in determining whether such an error may be declared harmless beyond a reasonable doubt: (1) the overall strength of the prosecution's case, see *High,* 260 Kan. at 486; *Crease,* 252 Kan. at 336; (2) whether an objection was lodged, *High,* 260 Kan. at 486; (3) whether the ex parte communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter, and the manner in which it was conveyed to the jury, *Rushen,* 464 U.S. at 121; *Rogers,* 422 U.S. at 40-41; *High,* 260 Kan. at 486; and (4) the ability of the post-trial remedy to mitigate the constitutional error. *Rushen,* 464 U.S. at 120-21. Ultimately, our decision must

revolve around whether we are able to decide beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. See *Crease*, 252 Kan. at 335-36.

(1) The overall strength of the prosecution's case.

The evidence in this case was not overwhelming. In fact it was balanced. As noted by the dissent in the Court of Appeals' opinion, this case boiled down to whether the jury would believe A.C. beyond a reasonable doubt. Her credibility was the central issue for the jury. See 24 Kan. App. 2d at 931.

While the State's case consumed 130 pages of the record, and the defendant's only 16 pages, the essence of the State's case was the credibility of A.C. Nine months after the event, A.C. was questioned by her mother concerning the incident. A.C. began to cry and related that she had been abused by the defendant. The idea of sexual abuse was suggested by Merrick in a discussion with the victim's grandmother. Just prior to raising this idea Merrick had been involved in a falling-out with the defendant.

The State called A.C.'s grandmother and mother, A.C. herself, and an SRS social worker who had interviewed A.C. In addition, the videotaped interview between A.C. and the social worker was played for the jury. However, Chief Whinery, to whom A.C. related her story soon after talking to her mother, was not called to testify.

The defendant testified and denied any wrong doing with the victim on the day in question. He offered an explanation of his conduct and was the only witness called for the defense. There was very little factual detail given as to the circumstances surrounding the sexual abuse. The incident was reported 9 months after it occurred, and there was no physical or medical evidence corroborating the incident. Thus, it was a question of A.C.'s word as compared to that of the defendant. In this respect, the case differs significantly from both *High* and *Crease*, where the evidence of guilt was overwhelming.

(2) Whether an objection was lodged.

In addressing this question the Court of Appeals relied heavily upon the findings of the hearing judge who presided over the motion for new trial. The Court of Appeals concluded:

"After a hearing on the matter, the district court denied McGinnes' motion for a new trial. The court found defense counsel was informed immediately of the ex parte communication but no objection was made and defendant made no effort to voir dire the jury. Additionally, the court could not find anything prejudicial or objectionable in the trial court's supplemental instruction, and even after the instruction, defense counsel again made no effort to voir dire the jury to see if a problem existed." 24 Kan. App. 2d at 925.

However, the above conclusions by the trial court and relied upon by the Court of Appeals are not supported in the record. The ex parte communication and the advice to counsel that such occurred was off the record. While the trial judge did notify counsel as to its ex parte communication with the jury, the time of notification is not established. Further, it is difficult to understand what an objection by the defendant would have accomplished. The trial judge supplied to the jury the reason why Chief Whinery did not appear as a witness and instructed the jury that such was not to be considered by the jury. Neither voir dire by defense counsel nor objection could change the information or instruction conveyed to the jury by the trial judge's ex parte communication.

The Court of Appeals also noted:

"At oral argument on this appeal, we explored this issue in depth. Had the jury requested through an appropriate communication with the court to know why Whinery had not testified, a reply similar to the two comments by the trial judge would have been appropriate. Therefore, we do not find prejudice." 24 Kan. App. 2d 921, 929, 955 P.2d 1325 (1998).

The above conclusion is speculation. Just as likely, the defense, upon being advised under proper procedure of the existence of a jury question as to why Chief Whinery had not testified, may well have objected to any information being given to the jury on this point. Without any evidence before the jury as to the reason, it would have been inappropriate for the trial judge to impart that information over objection to the jury. Defense counsel may have also requested an instruction that the State's failure to call Chief Whinery as a witness raises an inference that his testimony would not have been helpful to the State. See *State v. Wilkins*, 215 Kan. 145, 150-51, 523 P. 2d 728 (1974), and cases cited therein (the missing witness rule).

(3) Whether the ex parte communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter, and the manner in which it was conveyed to the jury.

(a) Critical Aspect

Unlike the situation in *High*, the communication by the trial judge with the jury during its deliberation in the instant case concerned a critical aspect of the trial. The sole question before the jury was the credibility of the victim as compared to the credibility of the defendant. The failure of the State to call Chief Whinery, a witness who had an opportunity to view and discuss the incident with the victim very shortly after the initial report of this incident, was significant. The trial judge without invitation and off the record apparently advised the jury that Chief Whinery was away at a training session and could not be available for trial. Additionally, the trial judge instructed the jurors that it was of no concern of theirs that Chief Whinery was absent. The best advice under the circumstances would have been no advice. Instead, the trial judge, without a record and without a request, supplied evidence not introduced at trial for the jury's consideration and instructed it on the law of the missing witness.

The effect of this erroneous advisement by the trial judge was enhanced due to the stage at which it occurred. We may assume that the jury was having difficulty in deliberations, for they requested a readback of testimony. It is significant that the readback request was not for the testimony of the victim but instead for the testimony of the mother who first heard the victim's statement. It is certainly possible that the jury was concerned about A.C.'s original story and wondered why Chief Whinery, who was the second person to hear the story, did not testify.

(b) The manner of communication.

The manner in which the trial judge conveyed the communication to the jury is troubling. A trial judge occupies a prominent position in any criminal trial. A statement by a trial judge to the jury is by and large received without question. In recognition of the significant role a judge plays in the trial of a case, PIK instruc-

tions are generally given to the jury so that it does not interpret a judge's rulings as an endorsement of either parties' case. See PIK Crim. 3d 51.05. In this case, the trial judge departed from his role. He supplied evidence to the jury that had not been admitted at trial, thereby encouraging the jury to disregard the lack of evidence from an important source.

The Court of Appeals concluded:

"We believe no actual prejudice has been shown. It is of importance in the factual situation here that the nonappearance of Whinery was apparently not an issue of significance. McGinnes does not claim, and the record does not reflect, that Whinery's testimony, or lack thereof, was of concern to the defense. Had the defense wanted Whinery present for the trial, he would have been subject to compulsory process. Also, the defense did not argue at trial to the jury or to the court that Whinery's not testifying was in any way significant." 24 Kan. App. 2d at 928.

Again the record does not support the above conclusion. Both the jury, as indicated by the juror's question, and the trial judge, by its ex parte communication, considered the absence of testimony from Whinery significant. From the standpoint of the defendant, the lack of testimony from a professional law enforcement officer who interviewed the victim within minutes after she reported it to her mother was significant.

While the defendant could have subpoenaed this witness, this begs the question, for the value of the witness to the defense was the witness' absence. Once the ex parte communication occurred, the defense was foreclosed from suggesting that there was another reason why Chief Whinery was not called by the State.

The record simply does not support the Court of Appeals' conclusion that Chief Whinery's testimony was insignificant. In fact, the only evidence suggests otherwise. The jury was concerned. The trial judge was concerned enough that he volunteered the reason why Chief Whinery was absent. By his action, the trial judge foreclosed any favorable inference Chief Whinery's absence may have had to the defendant.

(4) The ability of the post-trial remedy to mitigate the constitutional error.

In *Lovely*, 237 Kan. at 845, we examined the totality of the circumstances in regard to an alleged error involving the bailiff's comment to the jury during its deliberation. In the case at hand, the hearing judge presiding over the motion for new trial based his conclusion with regard to prejudice on the evidence presented on the motion for a new trial. He specifically found that he had no obligation to read the entire record. However, the very nature of the error alleged requires that a determination of whether the error is harmless beyond a reasonable doubt rests upon the totality of circumstances.

It is impossible to assess prejudice in this case without a consideration of the entire record. To the extent that the hearing judge did not consider the entire record in his determination and to the extent the Court of Appeals relied upon the findings of the trial court, both the hearing judge and the Court of Appeals erred.

While a post-trial hearing may in many cases provide a basis for diminishing the impact of the constitutional error, in this case it did not. Newly appointed defense counsel subpoenaed the trial judge, but because of circumstances involving injury to a family member or the judge, the district court relieved the trial judge from the subpoena. Even though the substance of a telephone conference with the trial judge and counsel was admitted, we are no more enlightened about what occurred during the conversation the judge had with the deliberating jury than was the district court that decided no prejudice had occurred. While there is hearsay testimony concerning the effect of the trial court's communication with the jurors, that evidence is not sufficient to convince us that the defendant's rights in this case were not prejudiced. The orderly conduct of the trial requires that the trial judge refrain from discussing or providing the jurors with evidence during their deliberations. The method by which this is accomplished is through written communication from the jurors to the judge, who with consultation of the parties, proceeds on the record to examine the matter.

*The trial judge's sua sponte supplemental instruction.*

The Court of Appeals concluded that it was error for the trial court to give the jury supplemental instructions without consulting with both counsel. On this point, we agree. However, the Court of Appeals concluded that such instructions did not prejudice the defendant in that they simply reiterated several of the instructions given during the judge's charge to the jury. 24 Kan. App. 2d at 929.

The dissent, however, did not view the supplemental instruction as separate and distinct from the initial ex parte communication: "There is no doubt in my mind that the above supplemental instruction was related to the previous ex parte communication [the trial judge] had with the jury and compounded the damage that had been done." 24 Kan. App. 2d at 932. We agree.

Sometime after the trial judge erroneously instructed the jurors that they should not concern themselves with Chief Whinery's absence, the jury requested a readback of A.C.'s mother's testimony. Chief Whinery and A.C.'s mother were the only persons to question A.C. on the day she reported the incident. It is, we believe, significant that no request was made for A.C.'s testimony, but rather for the testimony of a witness who had heard what A.C. said when she first reported the incident. Immediately after testimony of the mother was read back the trial judge without consulting counsel instructed the jury that "if you will concentrate on [the testimony that you have heard] and on what has been presented and not allow yourselves to be diverted or not try to speculate on things that have not been presented, I think it will be helpful to you in arriving at a decision."

The ex parte communication and the above quoted instruction are related in time. Both happened within the first 3 hours of jury deliberations and must be reviewed together as part of the whole. When reviewed in this context, we agree with the dissent that the *sua sponte* instruction reinforced the trial judge's earlier ex parte communication.

## CONCLUSION

We are unable in this case to declare beyond a reasonable doubt

that the ex parte communication reinforced by the erroneous supplemental *sua sponte* instruction had little, if any, likelihood of having changed the result of the trial. Some of the comments this court made in the case of *Howard v. Miller*, 207 Kan. 246, 485 P.2d 199 (1971), apply with equal force to the case we now consider. While *Howard* differs factually from the case at hand, it too involves a trial court's ex parte instruction to a deliberating jury. We noted:

"Since territorial days we have continuously had statutes providing that communication between court and jury as to the law in the case shall take place *in the presence of, or after notice to, the parties or their counsel.* Despite this plain injunction against private communication between judge and jury, our reports reflect many instances of its disregard, which practice has always been held to be erroneous. [Citation omitted.]" 207 Kan. at 249.

Quoting from the Massachusetts Supreme Court case *Lewis v. Lewis*, 220 Mass. 364, 107 N.E. 970 (1915), this court noted:

" 'Correct instructions upon matters of law are of the very substance of jury trial at common law. . . . Secret instructions or clandestine communications, no matter if given with the best of intentions, contravene this fundamental and essential conception of common law trial by jury.' " 207 Kan. at 252.

In the case at hand, the overall strength of the prosecution's case was balanced and the evidence was far from overwhelming. The ex parte communication concerned a critical aspect of the trial and bore directly on the issue of credibility. Furthermore, we note that substantial prejudice more than likely flowed from the comments of the trial judge. This notion is reinforced by the nature of the information conveyed to the jury, *i.e.*, the factual information not presented during the trial which provided an excuse for the non-appearance of a critical witness and an instruction to the jury that it should disregard the fact that the witness was not called. In addition, and particularly important to our resolution of this issue, is the manner in which this information was conveyed. We have found no other Kansas case where a trial judge, without invitation or without any question imposed directly to him or her either orally or in writing, interrupted a deliberating jury with comments bearing on the question of guilt or innocence.

The ex parte communication contravened the statutory law of the state of Kansas and the defendant's fundamental constitutional right. We agree with Judge Knudson's dissenting opinion that under the totality of circumstances in this case "[i]t is impossible . . . to conclude that John McGinnes received a fair trial." 24 Kan. App. 2d at 930.

Reversed and remanded for further proceedings.