No. 103,558

STATE OF KANSAS, *Appellee*, v. RANDY HERBEL, *Appellant*.

(299 P.3d 292)

Opinion filed April 5, 2013.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Nicole Romine*, assistant attorney general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, C.J.: Randy Herbel appeals his Jessica's Law convictions for rape and aggravated indecent liberties with a child. His issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court violate his constitutional and statutory rights when it replayed his recorded statement to a deliberating jury outside of his presence but in the courtroom? Yes, but harmless error.

2. Did the court err when it allowed the child victim to testify with a comfort person alongside her? Not preserved.

3. Was the court's jury instruction on reasonable doubt legally inappropriate? No.

Accordingly, we affirm Herbel's convictions.

## FACTS

On July 31, 2006, the Kansas Department of Social and Rehabilitation Services, (SRS) received two reports of child neglect involving S.C., a 5-year-old girl living in Hillsboro. The first reporter was anonymous and claimed that S.C. was covered in ringworm and was not receiving appropriate medical care. That source also reported that S.C.'s mother was having sex in front of her. The second reporter was her daycare provider, 40-year-old defendant Randy Herbel. He too reported that S.C.'s mother was not treating her for ringworm.

Wilma Mueller, an SRS social worker, began her investigation on August 3. According to her trial testimony, she met with S.C. and her mother in their house. Mueller observed that S.C. was covered in circular scabs. Mueller then met privately with S.C. and asked if her mother ever had friends visit. S.C. replied, "[Y]es, Jake, my mom's boyfriend, he has sex with my mom." Mueller then asked, "[W]hat's sex?" and S.C. whispered, "[T]hat's what Randy does to me." As Mueller further testified:

"[S.C.] said that when Randy puts [ointment for ringworm] on me, he covers my head with a towel, he takes his penis out, that she can feel it, that it's soft, and that he touches her pee-pee with his penis. She further said that she—that he did this lots of times when she was on his lap and in his bed, and then she stated that's when he stuck his penis in me."

Mueller then terminated the interview, contacted local law enforcement, and set up a sexual assault exam at Via Christi Medical Center in Wichita for that same day—August 3. Hillsboro Police Chief Daniel Kinning transported S.C. and her mother to the medical center where nurse practitioner Kathy Gill-Hopple conducted the exam.

Gill-Hopple began by taking S.C.'s medical history. According to Gill-Hopple's testimony, S.C. again stated that while Herbel was putting ointment on her naked body for ringworm he covered her head with a towel. His pants were off and "he touched his penis to her pee-pee and to her butt hole." When Gill-Hopple asked if it hurt, she replied that she was crying and that it hurt. Finally, Gill-Hopple asked S.C. if anything came out of Herbel's penis, and she replied, "[N]o, just juice, it was white." S.C. identified the incidents as occurring on the two previous days—August 1 and August 2—and one other unknown date. The sexual assault exam showed no signs of injury, which Gill-Hopple did not find unusual.

The next day social worker Mueller recorded a forensic interview of S.C. The DVD of the video interview was later admitted into evidence and played to the jury during the State's case-in-chief. On the DVD, S.C. stated that Herbel touched her butt and pee-pee with his penis three times. She reiterated that one time she was lying on her back naked on Herbel's bed, and he covered her head with a towel before touching her with his penis. S.C. additionally told Mueller that while Herbel said that he used a finger to touch her, she knew that he lied and used his penis. She also stated that Herbel stuck his penis inside her butt.

On August 17, approximately 2 weeks after S.C. was interviewed by Mueller, Chief Kinning interviewed Herbel. Herbel generally denied the allegations but admitted that he bathed and treated S.C. for ringworm.

On September 28, Chief Kinning and KBI Agent Rick Atteberry recorded their interview of Herbel. The DVD of the video interview was later admitted into evidence and played to the jury during the State's case-in-chief. Herbel discussed with them two incidents involving S.C., one occurring on August 1 and the second on August 2.

Regarding the August 1 incident, Herbel stated that after he gave S.C. a bath he placed her naked on his bed and treated her ringworm with calamine lotion. He also rubbed Vaseline on and near her vagina to treat the ringworm and another rash. According to Herbel, he rubbed the Vaseline on her vagina until he got aroused and then he stopped.

Regarding the August 2 incident, Herbel stated that he gave S.C. a bath and then again placed her naked on a towel on his bed. He again treated her with calamine and Vaseline. According to Herbel, after he rubbed the Vaseline on S.C.'s vagina for about 30 seconds, he then covered her head with a towel and began to masturbate. He claimed he bumped her clitoris with his penis and she said "ouch." He admitted that he "most likely" penetrated S.C. during the act and later admitted that he "probably" penetrated her.

During this same interview, Herbel also wrote and signed a statement paralleling most of his recorded one. The written statement was also admitted into evidence at trial during the State's case-in-chief.

The next day the State charged Herbel with one count of rape for the August 1 incident and one count of rape and one count of aggravated indecent liberties with a child for the August 2 incident. After several years of addressing Herbel's competency issues, the jury trial began in July 2009.

Included in the State's trial evidence was the brief testimony of now 8-year-old S.C. with her adoptive placement person on the witness stand beside her. S.C. testified that Herbel touched her bottom with his "pee pee," which she admitted meant his penis. But each time she was asked, she denied that he touched her vagina.

At the close of all the evidence, the State contended in its closing argument that the Count 1 rape charge was supported by the evidence that Herbel rubbed Vaseline on S.C.'s vagina on August 1. The State also argued that the Count 2 rape charge was supported by Herbel touching her vagina with his penis on August 2. It further argued that the Count 3 aggravated indecent liberties charge was supported by the evidence that he touched her butt with his penis that same day. During the State's closing argument, it played ex-

cerpts from Herbel's DVD interview with Chief Kinning and Agent Atteberry.

During the jury's deliberations, it asked to rewatch a part of the DVD containing the interview with Kinning and Atteberry where Herbel talked about the August 1 incident. The record on appeal clearly establishes that a part of the DVD was replayed for the jury in the courtroom but is silent on whether Herbel or his counsel was present.

The jury found Herbel not guilty of Count 1 (rape) for the August 1 incident. But it found him guilty of Count 2 (rape) and Count 3 (aggravated indecent liberties with a child), which stemmed from the August 2 incident. Under Jessica's Law, K.S.A. 21-4643, he was sentenced to a term of life in prison without the possibility of parole for 25 years.

Herbel timely appealed. Our jurisdiction arises under K.S.A. 22-3601(b)(1).

Additional facts will be added as necessary to our analysis.

### ANALYSIS

Issue 1: *The playback of Herbel's recorded interview violated his right to be present at every critical stage of the trial but was harmless error.*

#### Standard of review

Herbel argues that the replaying of the DVD to the deliberating jury in the courtroom and outside of his presence violated his rights under the Sixth Amendment to the United States Constitution and under Kansas statute to be present at every critical stage of his criminal trial. See *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353, *reh. denied* 398 U.S. 915 (1970); K.S.A. 22-3405(1) ("The defendant in a felony case shall be present . . . at every stage of the trial . . . except as otherwise provided by law."). He also points out that this includes the right to be present whenever the court communicates with the jury. See *State v. Garcia*, 233 Kan. 589, 596, 664 P.2d 1343 (1983) (citing *Shields v. United States*, 273 U.S. 583, 47 S. Ct. 478, 71 L. Ed. 787 [1927]). Because the right to be present is in issue, we are faced with a question of

law over which we exercise unlimited review. See *State v. Burns*, 295 Kan. 951, 955, 287 P.3d 261 (2012).

*Discussion*

After the jury retired for its deliberations, it returned to the courtroom where the judge went back on the record but did not announce appearances. The transcript is silent on whether Herbel or his counsel was present.

According to the judge's statement in the transcript, the jury had requested that it "hear that portion [of the DVD] that deals with the degree of penetration that may have occurred on the first day, on August the 1st." After a juror confirmed the request on the record, the judge advised that the prosecutor had informed him the requested portion is "actually [on] several different places [on] the disk." And due to incomplete indexing, the juror agreed that the court would begin by playing back the same portion that the prosecutor played during his closing arguments. The juror further agreed that after playing that portion the replay "may have to be expanded." Once played, the judge asked, "Anything else you want to hear?" to which the juror replied, "I think that's it." The jury then returned to its deliberations at 3:01 p.m. and returned to the courtroom with its verdict at 3:25 p.m.

In addition to Herbel's arguments based upon the Sixth Amendment and K.S.A. 22-3405(1), he points out that K.S.A. 22-3420(3) specifically addresses a defendant's right to be present during jury deliberations. It states:

"(3) After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or *the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."* (Emphasis added.) K.S.A. 22-3420(3).

The State admits that the record does not specify the presence of Herbel or his counsel at the time the DVD was replayed for the jury. It also admits that our caselaw is clear. "Where the record does not affirmatively reflect the presence of the defendant, this court will presume that the defendant's constitutional right to be

present was violated and that K.S.A. 22-3420(3) was not followed." *State v. Betts*, 272 Kan. 369, 391, 33 P.3d 575 (2001), *overruled on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007). But relying on our decision in *State v. Bolton*, 274 Kan. 1, 49 P.3d 468 (2002), the State argues that K.S.A. 22-3420(3) does not apply to videotaped testimony.

In *Bolton*, during the jury's deliberations it requested to again watch a video surveillance tape of the murder that had been admitted at trial without objection and played to the jury with the defendant present. Outside Bolton's presence, but in the presence of his counsel and counsel for the State, the court ordered a playback device be placed in the jury deliberation room and the jury rewatched the tape. Although Bolton's counsel did not object, Bolton argued on appeal that the jury's rewatching of the tape violated his right to be present at all critical stages of the proceeding.

We concluded "a jury's second viewing of exhibits admitted into evidence is not subject to the requirements of K.S.A. 22-3420(3)" because a videotape cannot be as easily manipulated as readback testimony. *Bolton*, 274 Kan. at 6. We stated:

"Here, the videotape was an exhibit which had been admitted into evidence during the course of the trial and had been played in open court before the jury and the defendant. A videotape is distinguishable from readback testimony in that the evidence on a videotape is static and is not susceptible to inflection or interpretation by a reader; regardless of the number of times a videotape is replayed or who plays the videotape, the message conveyed on the tape is the same." *Bolton*, 274 Kan. at 6.

Among other things, the *Bolton* court cited *State v. Fenton*, 228 Kan. 658, 620 P.2d 813 (1980), for the proposition that once a case is submitted to the jury, the jury is ordinarily given the exhibits to take into the jury room where it can examine the exhibits as many times as it desires. "The *Fenton* court noted that the manner in which exhibits are handled at trial is within the trial court's discretion, and the exercise of that discretion will not be disturbed on appeal except in cases of abuse. 228 Kan. at 667." *Bolton*, 274 Kan. at 6.

We disagree with the *Bolton* court's approach. We start, as we must, with the plain language of the statute. See *State v. Hopkins*,

295 Kan. 579, 581, 285 P.3d 1021 (2012) (quoting *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 3, 218 P.3d 400 [2009]) (" 'An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there.' ").

K.S.A. 22-3420(3) plainly states that if after deliberations begin the jury desires to be informed as to any part of the evidence arising in the case "the evidence shall be read *or exhibited to them.*" (Emphasis added.) So an error analysis that focuses upon the absence of either inflection changes or interpretations in a videotape is of no more relevance than the absence of inflection changes or interpretation in exhibiting the murder weapon itself. Moreover, the statute also plainly mandates that the evidence "shall be . . . exhibited to them *in the presence of the defendant* unless he voluntarily absents himself." (Emphasis added.) Consequently, where the jury has requested the officer conduct them to the court after deliberations began, the defendant has an absolute statutory right to be present when any evidence "is exhibited" to the jury after deliberations began.

Because we must presume under *Betts* that Herbel was not present, K.S.A. 22-3420(3) was violated. So our analysis now turns to the magnitude of the statutory error, *i.e.*, whether it mandates reversal of his convictions. And because the error arose in the context of the court's communication with the jury in the courtroom, Herbel's rights under K.S.A. 22-3405(1) and the Constitution were also violated. As we said in *State v. Bell*, 266 Kan. 896, 919-20, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999):

"K.S.A. 1998 Supp. 22-3405, as well as the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment, require a defendant's presence at every critical stage of a trial. See *Crease v. State*, 252 Kan. [326,] 333[, 845 P.2d 27 (1993)]. See also *State v. Lovely*, 237 Kan. 838, 844, 703 P.2d 828 (1985). *This includes all times when the jury is present in the courtroom and whenever the trial court communicates with the jury. State v. Perkins*, 248 Kan. 760, 769, 811 P.2d 1142 (1991)." (Emphasis added.)

While similar, the tests for determining the magnitude of constitutional error (when error infringes upon a constitutional right) and nonconstitutional error (when error does not infringe upon a

constitutional right) are nevertheless distinct. See *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). For nonconstitutional error, "the trial court should apply K.S.A. 60-261 and determine if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 542, Syl. ¶ 6. But for constitutional error,

"the trial court should apply the constitutional harmless error standard defined in *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967),] in which case the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." 292 Kan. 542, Syl. ¶ 6.

Under both tests, the party benefiting from the error bears the burden of demonstrating harmlessness. *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012) (nonconstitutional error); *Ward*, 292 Kan. at 568-69 (constitutional error). Clearly, the party benefiting from the constitutional error must meet a higher standard to show harmlessness than the standard required in nonconstitutional error.

So when, as here, the same acts or omissions represent both constitutional and nonconstitutional error, the question becomes whether the party benefiting from the error must demonstrate it meets both standards—when meeting the higher constitutional harmless error standard necessarily means the lower nonconstitutional harmless error standard has been met. To date, this court has not directly answered this question. See, *e.g.*, *State v. Backus*, 295 Kan. 1003, 1009, 287 P.3d 894 (2012) ("[E]ven under the more stringent test [for demonstrating harmless constitutional error], we are firmly convinced beyond a reasonable doubt that there was no impact on the trial's outcome."); *In re K.E.*, 294 Kan. 17, 25, 272 P.3d 28 (2012) ("Consequently, any failure was harmless under either standard expressed in *State v. Ward*. [Citation omitted.]"); see also *State v. Tully*, 293 Kan. 176, 207, 262 P.3d 314 (2011) (both standards applied as independent, alternative bases for measuring harmlessness).

In Herbel's case, where both the constitutional and nonconstitutional error clearly arise from the very same acts and omissions, we will logically begin with our harmlessness analysis of the constitutional error. This is because if we conclude the constitutional error is not harmless and reverse the convictions, there is no point in analyzing whether the State met the lower standard for harmlessness under K.S.A. 60-261.

In our review of the magnitude of the constitutional error created by playing the DVD to the jury in Herbel's absence, we are guided in our particular situation by specific factors first articulated by this court in *State v. McGinnes,* 266 Kan. 121, 967 P.2d 763 (1998). There,

"[a]fter deliberations began, the trial judge happened to be outside the jury room. One of the jurors posed a question, possibly to another juror, as to why the jury had not heard testimony from Police Chief Whinery." 266 Kan. at 124.

The trial judge then advised the jurors that the police chief was unable to be present at trial, provided the reason why, and advised the jury it should not be concerned with his absence. The *McGinnes* court found there was "no question that the trial court's ex parte communication with the jury violated the defendant's constitutional right to be present at all critical stages of the trial." 266 Kan. at 127.

After synthesizing federal and Kansas caselaw to help determine if the trial court's ex parte communication with the jury was harmless constitutional error, the *McGinnes* court developed the following four factors to consider: (1) the overall strength of the prosecution's case; (2) whether an objection was lodged; (3) whether the ex parte communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter, and the manner in which it was conveyed to the jury; and (4) the ability of a posttrial remedy to mitigate the constitutional error. 266 Kan. at 132; see *State v. Mann,* 274 Kan. 670, 684, 56 P.3d 212 (2002); *State v. Rayton,* 268 Kan. 711, 717, 1 P.3d 854 (2000).

While in *McGinnes* the trial court communicated with the jury in the absence of both counsel and parties, and in the instant case the trial court communicated only in the absence of Herbel and

his counsel, this distinction is without a difference when determining the magnitude of the harm to the criminal defendant. See *State v. Scales*, 261 Kan. 734, 739, 933 P.2d 737 (1997) (" 'Ex parte communications deprive the absent party of the right to respond and be heard.' ").

Instead of beginning our harmlessness inquiry by examining each factor in the numerical order listed by the *McGinnes* court, we start with the obvious. The jury wanted to hear that portion of the recorded Herbel interview "that deals with the degree of penetration that may have occurred on the first day, on August the 1st." The only charge against Herbel arising from the incident on August 1 was Count 1's rape—for which penetration obviously is an element. See K.S.A. 21-3502(a); K.S.A. 21-3501(1).

Because of incomplete indexing, it was agreed that the court would begin by playing back the same portion that the prosecutor played during his closing arguments, subject to further requests. Apparently satisfied with the replay as an answer, the jury then returned to its deliberations. Twenty-four minutes later it returned to the courtroom with its verdict. By acquitting Herbel on the only charge arising out of the August 1 incident—rape, which requires penetration—the jury apparently decided there was insufficient evidence of penetration after watching that particular portion of the DVD a third time.

Herbel discusses together the *McGinnes* factors 1 (strength of the prosecution's case) and 3 (critical or noncritical contents and their manner of communication). And he essentially allows that the jury's acquittal on Count 1 enables this court—and the jury—to believe Herbel's statement that he externally applied Vaseline to S.C. on August 1.

But Herbel argues that the replayed DVD excerpt also briefly referred to the August 2 incident for which he was convicted in Count 2 of rape. He contends that S.C. recanted at trial her prior statements that Herbel had touched her vagina. He further contends that because the professional witnesses' testimony was entirely based on S.C.'s pretrial statements, the State is left only with his DVD statement that "he bumped her vagina as he was masturbating."

But as the State emphasizes, this ignores several key points regarding the strength of the prosecution's case. We start by independently observing the admissions of penetration made by Herbel in his recorded interview with Kinning and Atteberry that was played to the jury in the State's case-in-chief:

> "Q: Did you penetrate a little bit inside the lips? . . .
> "A: Most likely I probably did. But I didn't do it intentionally.
> . . . .
> "Q: . . . Either you did or you didn't.
> "A: Most likely I did.
> . . . .
> "Q: It went in a little bit didn't it? It probably spread her [ ] lips a little bit?
> "A: It probably did (inaudible). I don't know.
> . . . .
> "Q: You rubbed your penis between her lips a little bit to the vagina? It went in a little bit?
> "A: Yeah.
> . . . .
> "Q: You spread her [ ] lips apart, right? Her vagina lips?
> "A: Yeah, I probably did, yes.
> . . . .
> "Q: It went inside a little bit probably, right? We are not saying you put it in all the way and screwed her Randy [inaudible.]
> "A: Yes, it probably did, because with the force . . . (inaudible).
> "Q: You did it with enough force to spread them?
> "A: Yes, I probably did. I mean yes."

Herbel also admitted in that same interview that when he "bumped her clitoris with his penis," S.C. said "ouch," a reaction indicating it was more than a slight tap.

As the State points out, Herbel's argument also ignores the admissions in his own written statement. That statement was also admitted into evidence. It states in relevant part:

> "The next day [August 2] I gave her another bath and did the same thing. This time I pulled out my penis and put a towel over her eyes. Then I started to jack off in front of her. On accent [accident] I rubbed my penis against her and then came on her leg. *I hit her citorse [clitoris] when I came up before I came and then she said ouch.*" (Emphasis added.)

Herbel does not contend on appeal that either his written or recorded admissions were coerced.

Additionally, S.C. told several witnesses before trial, *i.e.*, Mueller and Gill-Hopple, that Herbel used his penis to touch her vagina and butt. She specifically told Mueller that Herbel "touched her pee-pee with his penis." She further told Mueller that Herbel did this lots of times when she was on his lap and in his bed and "that's when he stuck his penis in me." During the later recorded interview with Mueller, S.C. said Herbel touched her pee-pee with his penis three times. She also told Gill-Hopple that he "touched his penis to her pee-pee and to her butt hole." When Gill-Hopple asked if it hurt, she replied that she was crying and that it hurt—a reaction that indicates it was more than a mere touch. While during trial she denied Herbel touching her vagina, her pretrial statements to the contrary must nevertheless be considered. We hold *McGinnes* factor 1 (strength of the prosecution's case) favors the State.

As for *McGinnes* factor 3—critical or noncritical content and manner of communication—the State argues that Herbel's situation does not truly involve a communication between court and jury. Rather, it involves simply allowing the jury to review evidence that had previously been admitted and viewed. We independently observe that "the ex parte communication concerned a critical aspect of the trial." See *McGinnes*, 266 Kan. at 132. But the record certainly does not reveal any statements by the court or the State other than those necessary for confirming the jury's request or for actually replaying the DVD to the jury's satisfaction.

As mentioned previously, given the jury's only question to the court, the jury obviously was only concerned about the penetration issue for the August 1 rape charge. Its acquittal on this charge within 24 minutes of watching this episode on the DVD, and its conviction on the rape charge for the August 2 incident, strongly suggest that playing the DVD had a determinative effect on the August 1 rape charge but little, if any, effect on the August 2 rape charge. So we generally agree *McGinnes* factor 3 favors the State.

As for Herbel's discussing together *McGinnes* factors 2 (whether objection lodged) and 4 (posttrial remedy ability to mitigate error), he acknowledges he and his counsel did not object to the DVD playback or file a posttrial motion. But he argues that it does not

appear from the record that he or his trial counsel was ever aware of the playback. See, *e.g.*, K.S.A. 22-3417 ("[I]f a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him."). Similarly, their lack of awareness means that their failure to ask for a mistrial or to file a motion for new trial cannot be held against Herbel.

In response, the State essentially cites *Fenton*, 228 Kan. 658, for the proposition that once a case is submitted to the jury, it is ordinarily given the exhibits to take into the jury room where they may be examined as many times as desired. And any decision to allow admitted exhibits to be viewed outside the defendant's presence is within the trial court's discretion. Because we distinguished Fenton in the earlier analysis, it simply does not assist the State. We therefore conclude *McGinnes* factors 2 and 4 favor Herbel.

After specifically reviewing the *McGinnes* factors, and considering the overall standard of review for determining the magnitude of constitutional error as articulated in *Ward*, 292 Kan. 541, we conclude the error in replaying the DVD excerpt was harmless. In other words, the State has proven "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." 292 Kan. 541, Syl. ¶ 6.

**Issue 2:** *Any error relating to the presence of the comfort person is not preserved.*

*Standard of review*

Herbel broadly argues that allowing S.C.'s adoptive placement person to sit on the stand with her violated his Sixth Amendment right to confront his accuser and thus violated his Fourteenth Amendment right to a fair trial. Specifically, Herbel alleges error because the trial court did not make any findings that showed S.C. actually needed a comfort person. The State responds that the trial court appropriately exercised its discretion.

We generally review a district court's decision regarding control of its trial proceedings for abuse of discretion. See *State v. Walker*,

252 Kan. 279, 290, 845 P.2d 1 (1993); *cf. Holt v. State*, 290 Kan. 491, 500, 232 P.3d 848 (2010) (recognizing district court's inherent authority to "manage litigation"); see also *State v. Rowray*, 18 Kan. App. 2d 772, 777, 860 P.2d 40, *rev. denied* 254 Kan. 1009 (1993) ("A trial judge has broad discretion to control examination of witnesses, and 'reviewing courts will not interfere unless discretion has been abused.' *State v. Mitchell*, 234 Kan. 185, 188, 672 P.2d 1 [1983].").

*Discussion*

S.C. was the State's first witness. The prosecutor simply announced: "State calls [S.C.]. I note she is in the witness stand, as is her adopted placement . . . ."

Herbel did not object to the adoptive placement person sitting on the stand with S.C. As a threshold matter, the State therefore argues the issue is not preserved because under this court's general rule, "issues not raised before the trial court cannot be raised on appeal," even if the defendant asserts "constitutional grounds for reversal." *State v. Astorga*, 295 Kan. 339, 350, 284 P.3d 279 (2012).

But as Herbel observes, under several exceptions to our general rule this court may consider issues raised for the first time on appeal. He relies upon two: (1) when the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; and (2) when consideration of the question is necessary to serve the ends of justice or to prevent the denial of fundamental rights. *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 (1967).

In response, the State first argues that Herbel's issue is essentially evidentiary-based, *i.e.*, Herbel allowed S.C.'s testimony—either comfort person based or comfort person influenced—to be admitted without objection. Citing *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009), and K.S.A. 60-404, it points out that "[a] party must launch a timely and specific objection to the admission . . . of evidence in order to preserve the evidentiary question for review."

The State also correctly points out that this strict standard has even been applied in cases involving an alleged violation of a de-

fendant's constitutional rights, citing *State v. Dukes*, 290 Kan. 485, 488-89, 231 P.3d 558 (2010) (argument that admission of State's exhibits violated the defendant's Confrontation Clause rights was not preserved for appeal because no specific and timely objection was raised). See *State v. Mays*, 277 Kan. 359, 384-85, 85 P.3d 1208 (2004). Similarly, we have observed that if we applied *Pierce's* fundamental rights exception to every evidentiary issue raised by a party because it implicates the right to a "fair trial," then the exception could swallow the rule. *State v. Richmond*, 289 Kan. 419, 429-30, 212 P.3d 165 (2009).

We need not determine whether the comfort person's presence created an evidentiary issue, however, because it may be resolved in a more straightforward manner. We begin by again observing that when given the opportunity during trial to object to the presence of the comfort person, Herbel obviously did not. And as both parties point out, during the jury instructions conference Herbel renewed his earlier request for the stock instruction under PIK Crim. 3d. 51.07, which states: "You must consider this case without favoritism or sympathy for or against either party. Neither sympathy nor prejudice should influence you." However Herbel did not ever request this instruction because of the presence of the comfort person but only because S.C. testified with a teddy bear.

"Obviously, Your Honor, our basis for that [instruction] is, the alleged victim in this case is eight years old now, was five years old when this happened. She sat there and *testified with a teddy bear in front of her, which I'm not saying that was inappropriate, but obviously common sense would indicate that jurors are going to have some sympathy for her* that she had to be in this situation for whatever reason. And I think it's appropriate, given those factual circumstances, that that instruction be given in this case." (Emphasis added.)

The judge agreed with defense counsel's statement that the instruction was disapproved by the PIK committee for general use but could be given under unusual circumstances. And while the judge found this case involved an alleged rape of a child, "that itself did not make it a unique or an unusual situation." He further found that the State's expert discovered no physical injury, which "might have tended to create more sympathy and generated more prejudice than this situation. So, I decline your request to give the in-

struction." So when Herbel raised the issue, the judge made find-ings and stated his conclusion.

As the State emphasizes, Herbel has not challenged on appeal the court's denial of his requested instruction. Rather, after at least two trial-level opportunities to either object to the presence of a comfort person or to further request that the impact be amelio-rated by a jury instruction, he has waited to challenge her presence for the first time on appeal.

Herbel argues on appeal that the trial court harmfully failed to make any inquiry about the necessity of a comfort person and therefore failed to make findings supporting the need. But his own repeated failures to raise the issue to the trial court before the jury's verdict demonstrates that he and his counsel obviously saw no rea-son to question the comfort person's presence on the stand. Yet he would require the trial court to *sua sponte* raise the issue, invite the presentation of evidence, make the fact-based determinations of necessity/nonnecessity, and then rule on the issue. Our caselaw suggests this is not the trial court's responsibility.

We begin our review with *State v. Ortega-Cadelan*, 287 Kan. 157, 194 P.3d 1195 (2008), where for the first time on appeal the defendant raised the unconstitutionality of his sentence imposed under Jessica's Law: mandatory life without the possibility of parole for 25 years and lifetime postrelease supervision. Specifically, he argued that his sentence was cruel or unusual under § 9 of the Kansas Constitution Bill of Rights. Like Herbel, Ortega-Cadelan asked that we apply one of the *Pierce* exceptions and consider his issue "to serve the ends of justice." 287 Kan. at 159.

We observed the problem with Ortega-Cadelan's argument was "that we must be able to consider the merits of the issue to deter-mine if justice demands its resolution." 287 Kan. at 160. We further observed that our particular test to analyze his argument on the merits—that his life sentence for sex crimes against minors was a cruel or unusual punishment—required factual determinations. But because he failed to raise this issue before the district court, "neither party had an opportunity to present evidence or make arguments to the district court." 287 Kan. at 161. This failure meant there were no facts or findings in the record allowing this

court to address the merits and ultimately permitting them to serve as a basis for our ruling. So we declined to apply any of the three *Pierce* exceptions and held his argument was not properly before this court. 287 Kan. at 161.

We have repeatedly affirmed our *Ortega-Cadelan* approach in cases where the defendant not only has argued his Jessica's Law sentence was unconstitutional under section 9 of the Kansas Constitution Bill of Rights, but also the Eighth Amendment to the United States Constitution. See *State v. Plotner*, 290 Kan. 774, 783-84, 235 P.3d 417 (2010) (listing cases to date). As we stated in *Plotner*, "[b]ecause this issue was not raised below, the record is devoid of the facts this court needs to evaluate it." 290 Kan. at 784. We again held that none of the *Pierce* exceptions applied and Plotner was therefore prohibited from raising this issue for the first time on appeal.

In yet another Jessica's Law case, we emphasized that even when a party has raised an issue in the trial court to preserve it for appeal, the party nevertheless had an additional obligation to supply a sound foundation for our appellate review. In *State v. Seward*, 289 Kan. 715, 217 P.3d 443 (2009), the trial judge said nothing in response to Seward's constitutional challenges to Jessica's Law. We held: "In the future, a defendant who wishes to appeal on the basis of a constitutional challenge to a sentencing statute must ensure the findings and conclusions by the district judge are sufficient to support appellate argument, by filing of a motion invoking the judge's duty under Rule 165, if necessary." 289 Kan. at 721; see also *State v. Edwards*, 290 Kan. 330, 335, 226 P.3d 1285 (2010) ("litigant must object to inadequate findings of fact and conclusions of law before the trial court to preserve the issue for appeal," citing *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 [2006]).

And as we noted in *State v. Davis*, 281 Kan. 169, 178, 130 P.3d 69 (2006), Supreme Court Rule 165 requires the judge to state the controlling facts and the legal principles controlling his or her decision only when the matter is contested. See Rule 165 (2009 Kan. Ct. R. Annot. 239) ("In all contested matters submitted to a judge without a jury . . . , the judge shall state the controlling facts re-

quired by K.S.A.60-252, and the legal principles controlling the decision.") Here, Herbel not only failed to contest the comfort person matter, but he also entirely failed to raise it as an issue.

Finally, Herbel asks us to revisit the holding in a case extensively briefed by both parties: *Rowray*, 18 Kan. App. 2d 772. But *Rowray* is readily distinguishable from the instant case because there the defendant objected to the use of a mother as a comfort person who sat near her child victims on the witness stand. So revisiting *Rowray* is unnecessary to resolve the instant case.

For the above reasons, Herbel cannot raise this issue for the first time on appeal.

Issue 3: *The reasonable doubt jury instruction was legally appropriate.*

After Herbel received our permission to raise and brief an issue for the first time on appeal, he filed a supplemental brief to argue that the trial court committed structural error when it used an older version of the stock PIK Crim. 3d 52.02 instruction. That instruction, No. 2, deals with the burden of proof, the presumption of innocence, and reasonable doubt. It states in relevant part:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.)

Herbel argues that the trial court instead should have issued the version of PIK Crim. 3d 52.02 that was in effect at the time of his 2009 trial and has been recommended by the PIK committee since it released its 2004 Supplement. That version states in relevant part:

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of *each* of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.)

He claims the trial court's instruction improperly dilutes the State's burden of proof.

*Standard of review*

Herbel did not object to instruction No. 2 below. Therefore, our standard of review is informed by K.S.A. 22-3414(3) and *State v. Williams*, 295 Kan. 506, 286 P.3d 195 (2012).

As we stated in *Williams*, a jury instruction issue, like other issues, is subject to a stair-step process on appeal:

"(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." *Williams*, 295 Kan. 506, Syl. ¶ 1.

Regarding the first step, in *Williams* we recognized that K.S.A. 22-3414(3) creates a procedural hurdle for a party that fails to object or request a jury instruction.

"K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court." *Williams*, 295 Kan. 506, Syl. ¶ 3.

We explained in *Williams* that the test to determine whether the instruction is clearly erroneous is composed of two parts. First, "the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *Williams*, 295 Kan. 506, Syl. ¶ 4.

If error is found, then the second part is considered, *i.e.*, the clearly erroneous analysis moves to a reversibility inquiry and

"the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶ 5.

Accord *State v. Tapia*, 295 Kan. 978, 996, 287 P.3d 879 (2012).

*Discussion*

Accordingly, we must first determine if the reasonable doubt instruction was legally and factually appropriate.

Herbel relies heavily on the Court of Appeals' opinion in *Miller v. State*, No. 103,915, 2012 WL 401601 (Kan. App. 2012) (unpublished opinion), *rev. granted* March 4, 2013. Indeed, *Miller* is why Herbel wanted to file a supplemental brief because *Miller* was released after the filing of the original briefs in his case. In *Miller*, the trial court transposed the words "each" and "any" in giving a jury instruction based on the current version of PIK Crim. 3d 52.02. So it read as follows:

" 'The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of *each* of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you should find the defendant guilty.' " *Miller*, 2012 WL 401601, at *2.

The *Miller* panel held that by transposing these two words in the stock PIK instruction, the district court altered the burden of proof. As a result, the beyond a reasonable doubt standard was turned "inside out," which allowed the State to obtain a conviction "with patently insufficient evidence." 2012 WL 401601, at *2. So the panel found structural error, reversed the trial court's denial of Miller's motion under K.S.A. 60-1507 and remanded for a new trial, finding his original appellate counsel ineffective for failing to raise the argument. *Miller*, 2012 WL 401601 at *4-5, *9.

But as the State points out, Herbel's case is different. The two words are not transposed. The State argues that while the word "each" may be preferable to the word "any" in this last sentence of Instruction No. 2, this is not an incorrect statement of the law. See *Williams*, 295 Kan. 506, Syl. ¶ 4 (To determine if there is error, the appellate court must consider whether the instruction was legally appropriate.). In making our determination, we observe that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of

proof." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994).

We also observe that 8 years ago in *State v. Beck*, 32 Kan. App. 2d 784, 88 P.3d 1233, *rev. denied* 278 Kan. 847 (2004), the Court of Appeals rejected this exact argument now made by Herbel. More specifically, the *Beck* defendant objected at trial to the then stock instruction contained in PIK Crim. 3d 52.02. He argued that the use of the word "any" in the final sentence of the instruction could somehow create ambiguity or result in his being convicted if only one element of the crime was proven by the State.

In rejecting this same argument, the *Beck* panel specifically held:

"Again, Beck is focusing on one word of the instruction in isolation from its context. The word 'any' is used consistently in the instruction. The sentence immediately preceding the language Beck finds objectionable states: 'If you have a reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you must find the defendant not guilty.' (Emphasis added.) We reject Beck's argument that the word 'any,' as used in this context, could somehow create ambiguity or result in Beck being convicted if only one element of the crime is proven." 32 Kan. App. 2d at 787.

The *Beck* panel reinforced its holding by stating that any possible confusion was eliminated by the elements instruction:

"Furthermore, Instruction No. 11, listing the elements of the crime of aggravated escape from custody, contains the language: 'To establish this charge, *each* of the following claims must be proved . . . .' (Emphasis added.) This language negates any potential confusion that may have been caused by the use of the word 'any' in Instruction No. 6." 32 Kan. App. 2d at 787-88.

Similarly, Herbel's Instructions Nos. 3, 4 and 5—which set out the individual elements for each of the three charged crimes—all contain the following language: "To establish this charge, *each* of the following claims must be proved." (Emphasis added.) In this respect, it is quite similar to *State v. Womelsdorf*, 47 Kan. App. 2d 307, 274 P.3d 662 (2012), *petition for review filed* May 10, 2012. There, in distinguishing *Miller*, the panel discussed *Beck* at length. In support of its holding which affirmed *Beck*'s rationale, the panel noted that the elements jury instruction on arson, as well as on the lesser included offenses of arson of an automobile and fraudulent insurance act, all provided " 'to establish this charge, *each* of the

following claims must be proved . . . .' " *Womelsdorf*, 47 Kan. App. 2d at 333. As the *Beck* court recognized, such language helps "negate any potential confusion" that may have been caused by the use of the word "any" in the reasonable doubt instruction. 32 Kan. App. 2d at 788.

We further observe that in addition to the *Womelsdorf* panel, numerous panels have recently reaffirmed *Beck*. See *State v. Burdick*, No. 103,263, 2012 WL 5869433, at *4-5 (Kan. App. 2012) (unpublished opinion), *petition for review filed* December 17, 2012; *State v. Snowden*, No. 107,284, 2012 WL 5869612, at *12-14 (Kan. App. 2012) (unpublished opinion), *petition for review filed* December 17, 2012; *State v. Osborn*, No. 106,743, 2012 WL 5392130, at *6 (Kan. App. 2012) (unpublished opinion), *petition for review filed* November 13, 2012.

For these reasons, we agree with the rationale and holding of *Beck*. While the older PIK instruction used in Herbel's trial was not the preferred instruction, it was legally appropriate. See *Womelsdorf*, 47 Kan. App. 2d at 334 (The reasonable doubt instruction was not clear misstatement of law, as in *Miller*. "[T]he reasonable doubt instruction provided in Womelsdorf's case, while not the best practice, was not clear error."). *Burdick*, 2012 WL 5869433, at *4 ("Although the new version of PIK Crim. 3d 52.02 clarifies reasonable doubt, it does not make the old version of the instruction bad law.").

Before ending our analysis, we must note that on November 28, 2012, 13 days before oral argument to this court, Herbel filed three two-page letters per Supreme Court Rule 6.09 (2012 Kan. Ct. R. Annot. 49.). All were in support of the following issue in his supplemental brief: "The district court erred in giving a reasonable doubt instruction that lowered the State's burden of proof." Rule 6.09(b)(1)(A) states:

"Not later than 14 days before oral argument, a party may advise the court, by letter, of citation to persuasive and controlling authority that has come to the party's attention after the party's last brief was filed. *If a persuasive or controlling authority is published less than 14 days before oral argument, a party promptly may advise the court, by letter, of the citation.*" (Emphasis added.)

Due to the timing of Herbel's letters, they are limited to advising us of recent authority published within 14 days of December 11, 2013—his scheduled date of argument. The most recent case cited by Herbel is 2003. For this reason alone, the letters are improper under Rule 6.09(b)(1)(A). See *Shrader v. Kansas Dept. of Revenue*, 296 Kan. 3, 290 P.3d 549 (2012). Because they are improper, they will not be considered. See *State v. Houston*, 289 Kan. 252, 277, 213 P.3d (2009) ("The appellate courts will not consider those parts of a Rule 6.09 letter that fail to comply with the rule.").

We also note that at oral arguments Herbel's counsel candidly explained that she filed three different letters because Rule 6.09(b)(1)(C) (2012 Kan. Ct. R. Annot. 50) states that "the body of the letter submitted under this subsection may not exceed 350 words." And she had more than 350 words to say. While inventive, this action also is an incorrect application of the rule.

The combined length of the letters, plus the various arguments made and older legal authorities cited in each, clearly reveal that these all could have been easily included in Herbel's supplemental brief. See *Houston*, 289 Kan. at 277 (statements should have been argued in a supplemental brief to this court, as Rule 6.09 was not intended to be, nor should it be, used as yet another briefing opportunity.).

Affirmed.