NOT DESIGNATED FOR PUBLICATION

No. 120,929

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARCUS D. PUGH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed January 22, 2021. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: Following a bench trial, the district court found Marcus Pugh guilty of possession of marijuana with the intent to distribute and possession of a weapon by a felon. On appeal, Pugh questions the sufficiency of the evidence on the possession cases and claims he has a constitutional right to possess a weapon. The State presented sufficient evidence of constructive possession of the drugs. Pugh establishes no reason why this court should consider his constitutional claim for the first time on appeal. We affirm.

1

Late in the morning on June 28, 2016, Detective Kenneth Davis of the Wichita Police Department interviewed Marcus Pugh regarding a robbery. During that interview, Pugh confirmed his home address and stated he lived there with his girlfriend. After the interview, he was booked into the Sedgwick County Detention Facility.

That evening, Pugh placed a phone call to Terrika Holt, who rented the house and lived at the address Pugh gave in his interview. During the call, Pugh stated that he thought a firearm he referred to as a "pistola" was in the kitchen. Holt responded that she knew. Later, Pugh told Holt that she could make $1,200 if she went to the freezer "where I be putting stuff at." Pugh directed Holt to make four packages of drugs for sale, which he referred to as "dubs," and place them under the grill outside. The call was recorded, reviewed, and forwarded to Detective Davis.

The next day, Detective Davis requested a warrant to search the house for a firearm. That morning, Pugh called Holt three times. During their first conversation, which was before officers arrived, they talked about how Holt had slept next to the "burner"—a handgun. Pugh also explained how to divide drugs into several smaller units and sell them to his uncle. A few hours later, during their second conversation, Holt said the police were at the house to search for a gun; Pugh reassured her because the gun was in her name. And in their last call, about an hour later, Pugh told Holt to leave the house after she expressed concern about going to jail if police found the "kill," which is a higher-quality marijuana usually compacted into bricks.

Police obtained a warrant and searched the house. Officers found a Hi-Point .380 pistol under an inflatable mattress in a bedroom and digital scales and a Hi-Point Firearms box in the bedroom closet. Between the rafters of the unfinished basement, they discovered a plastic bag containing 800 grams of marijuana pressed into two bricks.

Although officers did not find a gun in the kitchen or drugs in the freezer, they found a water bill for the house bearing Pugh's name in a kitchen drawer. When subsequently examining the items for fingerprints, police matched a print on the marijuana's plastic bag to Holt and multiple prints on an ammunition tray and a plastic tool bag in the gun box to Pugh.

Detective Davis interviewed Pugh again after the search. Pugh stated he spent the majority of his time—three or four days a week—at the house. He was not aware of the marijuana. He also knew Holt owned a gun, which he described as a P4, and though he initially denied knowing a gun was in the house, he later stated it might have been there. He also explained that he did not handle the gun, though he might have touched it several months earlier.

The State charged Pugh with possession of marijuana with the intent to distribute and, based on a prior felony conviction, criminal possession of a weapon by a felon. The information alleged these crimes occurred on or between June 28 and June 30, 2016. Both Holt and Pugh testified at the bench trial. They denied dating, explaining that they were friends who had casual sex. They testified Pugh did not have a key and did not live at the house. Holt testified she let him come over to take showers because he let her place some bills in his name. Pugh stated he used K2, not marijuana.

As for their phone conversations, it was claimed that the "pistola" was a stun gun disguised as a smartphone, which Holt placed in her purse and eventually threw away. The discussion about packaging and selling drugs was alleged not to be about marijuana but a small rock of crack cocaine that Pugh had hidden in the freezer. Pugh stated he had previously sold crack. In their phone calls, Pugh was trying to explain to Holt how to divide it. Holt explained that after the search, she retrieved the crack from the freezer and called the police. When a detective refused to discuss the case with her, she flushed it down the toilet. It was claimed that the marijuana likely came from Holt's former

3

boyfriend who sold marijuana before his death. The basis for this statement was as a rumor that his drugs were still in the house. Detective Davis stated that he did not find any crack when searching the freezer and received no phone call from Holt after the search.

After hearing the evidence, the district court found Pugh guilty on both counts. The court discounted Pugh and Holt's testimony, finding their discussion about the crack and stun gun lacked credibility. Based on Pugh's visits to the home, the phone conversations, the results of the search, and Pugh's fingerprints on the gun accessories, the district court found Pugh constructively possessed the marijuana and firearm. The court sentenced him to a controlling 122-month term of imprisonment. Pugh appeals.

ANALYSIS

Pugh raises two arguments on appeal. He contends the State presented insufficient evidence to support his convictions. For the first time on appeal, he asserts K.S.A. 2019 Supp. 21-6304(a), which criminalizes the possession of a weapon by a person convicted of a felony, unconstitutionally infringes his right to bear arms under section 4 of the Kansas Constitution Bill of Rights.

*Sufficient Evidence Indicates Pugh Constructively Possessed the Marijuana and Gun.*

Pugh asserts the State failed to present sufficient evidence that he constructively possessed the drugs and the gun. When a defendant challenges the sufficiency of the evidence, an appellate court reviews the evidence "in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Rosa*, 304 Kan. 429, Syl. ¶ 1, 371 P.3d 915 (2016). When doing so, the court does not reweigh the evidence, resolve conflicting evidence, or reassess witness credibility. *State v. Keel*, 302 Kan. 560, 566, 357 P.3d 251 (2015).

4

The two charges against Pugh required the State to prove Pugh possessed the drugs and gun. See K.S.A. 2019 Supp. 21-5705(a); K.S.A. 2019 Supp. 21-6304(a). Possession requires either "joint or exclusive control over an item with knowledge of and intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." K.S.A. 2019 Supp. 21-5701(q); see K.S.A. 2019 Supp. 21-5111(v). As the definition contemplates, possession occurs in different ways. An item may be held immediately and exclusively, jointly with another, or constructively. *Keel*, 302 Kan. 560, Syl. ¶ 1.

To prove constructive possession it must be shown that a defendant maintained an item in a place over which he or she has some measure of access and right of control. The defendant's mere presence or access to the item is insufficient. See *Rosa*, 304 Kan. 429, Syl. ¶ 3 (applied to nonexclusive control of premises where drugs were found); *Keel*, 302 Kan. 560, Syl. ¶¶ 1-2 (same). Courts look to circumstantial evidence to evaluate constructive possession. As applied to drug cases, relevant factors include:

> "1. whether the defendant previously participated in the sale of a controlled substance;
> "2. whether the defendant used controlled substances;
> "3. whether the defendant was near the area where the controlled substance was found;
> "4. whether the controlled substance was found in plain view;
> "5. whether the defendant made any incriminating statements;
> "6. whether the defendant's behavior was suspicious;
> "7. whether the defendant's personal belongings were near the controlled substance." PIK Crim. 4th 57.040 (2018 Supp.).

See also *Keel*, 302 Kan. 560, Syl. ¶ 2 (listing four factors for drug possession); *State v. Abbott*, 277 Kan. 161, Syl. ¶ 5, 83 P.3d 794 (2004) (listing similar factors); *State v. Beaver*, 41 Kan. App. 2d 124, 129, 200 P.3d 490 (2009) (six nonexclusive factors).

Pugh's initial contention is that the State failed to prove he possessed the marijuana or the gun on the dates listed in the information because he was incarcerated during that time. However, a person may still constructively possess an item while incarcerated. See *Wilson v. State*, No. 119,227, 2019 WL 2553702, at *4 (Kan. App. 2019) (in K.S.A. 60-1507 motion, denying ineffective assistance of counsel claim based on failure to object to evidence obtained from the petitioner's house while incarcerated). Courts in other jurisdictions have recognized that an incarcerated individual may constructively possess an item by giving instructions to another person. See *Commonwealth v. Vick*, No. 14–P–195, 2015 WL 3540467, at *2 (Mass. App. Ct. 2015) (unpublished opinion) (noting the defendant could constructively possess a gun through an agent); *Mosby v. State*, No. 59836, 2012 WL 5834931, at *1 (Nev. 2012) (unpublished opinion) (incarcerated defendant's instruction to girlfriend that she remove weapon from his car sufficient for constructive possession); *State v. Pitts*, No. 2015AP1056–CR, 2016 WL 731891, at *1-2 (Wis. Ct. App. 2016) (unpublished opinion) (incarceration does not sever a person's possessory relationship with items outside jail).

Pugh also argues several factors indicate he did not possess the marijuana. He did not live in or have a key to the house, the marijuana was not found in plain view, police did not find any of his personal belongings in the house, and he did not display any suspicious behavior. Although he stated that he had sold drugs, there was nothing tying him to the marijuana found in the house. He claims Holt's former boyfriend left it there. The State focuses on Pugh's initial interview statement that he lived at the house and the subsequent suspicious and incriminating phone calls to Holt.

Viewed in the light most favorable to the State, sufficient evidence indicates Pugh constructively possessed the marijuana. The marijuana was not in plain view, and neither Pugh nor his personal belongings were near the drugs. However, Pugh admitted to using a controlled substance. See K.S.A. 2019 Supp. 21-5706(b)(7) (illegal to possess any substance designated under K.S.A. 65-4105[h]) (listing various cannabinoids); *State v.*

*Rizal*, 310 Kan. 199, 200, 445 P.3d 734 (2019) (noting naphthoylindole, prohibited under K.S.A. 65-4105[h][2], is a synthetic cannabinoid known as K2). He described his prior experience in preparing and selling drugs. Despite conflicting testimony about the extent of his access to the house, Pugh had regular and ongoing access.

Pugh's incriminating conversations with Holt strongly support constructive possession. In their first call, Pugh told Holt to go to the freezer "where I be putting stuff at" and instructed her to package drugs. The next day, he went into more detail about how to divide the drugs. These conversations indicate that despite his incarceration, Pugh still exerted control over the drugs. During their last call, Holt expressed concern about the police finding marijuana. This discussion about the marijuana creates a reasonable inference that Pugh knew of the marijuana. Pugh gave Holt specific instructions to retrieve, divide, and to make multiple packages of "the stuff." That is not consistent with Pugh's claim the "stuff" in the freezer was a single rock of cocaine. The search by law enforcement revealed no drugs other than marijuana. The State presented sufficient evidence that Pugh constructively possessed the marijuana.

Pugh also contends the State presented insufficient evidence that he possessed the firearm. The gun was purchased, owned, and placed under the air mattress by Holt; there was no evidence the gun was kept in the kitchen; Pugh was in jail during the dates included in the information; and his fingerprints were not found on the gun. The State notes Pugh lived in the house, discussed the gun multiple times with Holt, knew where she purchased the gun, and his fingerprints were on an ammunition tray and gun tool bag. Thus, constructive possession exists as he "knew where the gun was from, how it worked, . . . where it was kept," and instructed Holt to take the gun from the kitchen.

Though less compelling, there is sufficient evidence to support Pugh's conviction for possession of a weapon by a felon. The district court did not find Pugh and Holt's testimony that the "pistola" was actually a stun gun to be credible. But police did find a

gun at the house. It is reasonable to infer the "pistola" referred to Holt's gun. Pugh knew about the gun—he referenced it in multiple conversations with Holt. In his June 28 call, he correctly believed it was in the kitchen.

Pugh also had the right to control the gun. Unlike the marijuana, Pugh did not explicitly tell Holt to do anything with the gun. But during their June 28 conversation, Holt understood that Pugh wanted her to take the gun out of the kitchen. She did so, going so far as to sleep next to it. Holt complied with what she believed Pugh wanted her to do with the gun, establishing his right of control over it.

Viewed in a light most favorable to the State, sufficient evidence indicates Pugh constructively possessed both the marijuana and the gun.

*Pugh Has Not Preserved His Section 4 Claim and Does Not Assert a Persuasive Reason Why That Section Is Broader Than the Second Amendment.*

Pugh also challenges his weapon possession conviction on constitutional grounds. Based on a July 2005 conviction for aggravated robbery—a person felony—while using a firearm, Pugh is prohibited from possessing a firearm. See K.S.A. 2019 Supp. 21-6304(a)(1), (c)(2). Based on this prohibition, he was charged and convicted under K.S.A. 2015 Supp. 21-6304(a)(1) for possessing the gun. For the first time on appeal, Pugh argues this conviction requires reversal as the statute impermissibly infringes his right to possess a firearm under section 4 of the Kansas Constitution Bill of Rights.

Pugh acknowledges that he did not raise this argument before the district court. Appellate courts generally do not hear constitutional arguments first raised on appeal. *State v. Swint*, 302 Kan. 326, Syl. ¶ 3, 352 P.3d 1014 (2015). Pugh invokes two exceptions: when "[t]he newly asserted claim involves only a question of law arising on

proved or admitted facts and is determinative of the case" and when "consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights." 302 Kan. 326, Syl. ¶ 3. He argues both apply, claiming the right to bear arms is fundamental and the extent of section 4 is a legal question.

The general rule that an issue must be raised at trial in order that it be considered on appeal are prudential considerations and not jurisdictional. There has been no bright line established which would require an appellate court to accede to one of these claimed exceptions. *State v. Gross*, 308 Kan. 1, 6, 417 P.3d 1049 (2018). Appellate courts have the discretion whether to apply one of the exceptions to the general rule. Even if an exception might permit review of an unpreserved issue, an appellate court is not obligated to exercise its discretion and review the case. *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017).

Because Pugh failed to raise this issue at trial, there is a lack of evidence in the record to supply this court a sound foundation for meaningful review. This leads our court to decline to review Pugh's claim of error. *State v. Herbel*, 296 Kan. 1101, 1116-1120, 299 P.3d 292 (2013). Pugh has not shown in his brief why section 4 of the Kansas Constitution Bill of Rights requires a broader interpretation than the Second Amendment to the United States Constitution, which further confirms the decision not to review this issue.

Affirmed.